# Illinois Official Reports

## Supreme Court

***People v. Austin*, 2019 IL 123910**

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. BETHANY AUSTIN, Appellee. |
| Docket No. | 123910 |
| Filed | October 18, 2019 |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, the Hon. Joel D. Berg, Judge, presiding. |
| Judgment | Reversed.<br>Cause remanded. |
| Counsel on Appeal | Kwame Raoul, Attorney General, of Springfield (David L. Franklin, Solicitor General, and Michael M. Glick and Garson S. Fischer, Assistant Attorneys General, of Chicago, of counsel), for the People.<br><br>Igor Bozic, of West Dundee, for appellee.<br><br>Maryanne C. Woo, M. Patrick Yingling, and Stephanie A. Gerstetter, of Reed Smith LLP, of Chicago, for *amicus curiae* Cyber Rights Initiative. |

Justices        JUSTICE NEVILLE delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Thomas, Kilbride, and Burke concurred in the judgment and opinion.

Justice Garman dissented, with opinion, joined by Justice Theis.

**OPINION**

¶ 1        Defendant Bethany Austin was charged with violating section 11-23.5(b) of the Criminal Code of 2012 (720 ILCS 5/11-23.5(b) (West 2016)), which criminalizes the nonconsensual dissemination of private sexual images. On defendant's motion, the circuit court of McHenry County dismissed the charge, finding that provision facially unconstitutional as an impermissible restriction on the right to free speech as guaranteed by the United States and Illinois Constitutions. U.S. Const., amend. I; Ill. Const. 1970, art. I, § 4. The State filed a direct appeal challenging the judgment of the circuit court. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013). We now reverse and remand the cause to the circuit court for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3        Defendant was engaged to be married to Matthew, after the two had dated for more than seven years. Defendant and Matthew lived together along with her three children. Defendant shared an iCloud account with Matthew, and all data sent to or from Matthew's iPhone went to their shared iCloud account, which was connected to defendant's iPad. As a result, all text messages sent by or to Matthew's iPhone automatically were received on defendant's iPad. Matthew was aware of this data sharing arrangement but took no action to disable it.

¶ 4        While Matthew and defendant were engaged and living together, text messages between Matthew and the victim, who was a neighbor, appeared on defendant's iPad. Some of the text messages included nude photographs of the victim. Both Matthew and the victim were aware that defendant had received the pictures and text messages on her iPad. Three days later, Matthew and the victim again exchanged several text messages. The victim inquired, "Is this where you don't want to message [because] of her?" Matthew responded, "no, I'm fine. [S]omeone wants to sit and just keep watching want [*sic*] I'm doing I really do not care. I don't know why someone would wanna put themselves through that." The victim replied by texting, "I don't either. Soooooo baby …."

¶ 5        Defendant and Matthew cancelled their wedding plans and subsequently broke up. Thereafter, Matthew began telling family and friends that their relationship had ended because defendant was crazy and no longer cooked or did household chores.

¶ 6        In response, defendant wrote a letter detailing her version of events. As support, she attached to the letter four of the naked pictures of the victim and copies of the text messages between the victim and Matthew. When Matthew's cousin received the letter along with the text messages and pictures, he informed Matthew.

¶ 7        Upon learning of the letter and its enclosures, Matthew contacted the police. The victim was interviewed during the ensuing investigation and stated that the pictures were private and

- 2 -

only intended for Matthew to see. The victim acknowledged that she was aware that Matthew had shared an iCloud account with defendant, but she thought it had been deactivated when she sent him the nude photographs.

¶ 8     Defendant was charged by indictment with one count of nonconsensual dissemination of private sexual images. 720 ILCS 5/11-23.5(b) (West 2016). She moved to dismiss the charge, asserting, *inter alia*, that the statute is facially unconstitutional because it is a content-based restriction of speech that is not narrowly tailored to serve a compelling government interest, in violation of the federal and state constitutions. U.S. Const., amend. I; Ill. Const. 1970, art. I, § 4.

¶ 9     The State opposed defendant's motion, arguing that the type of speech restricted by the statute is not constitutionally protected and that the statute is narrowly tailored to serve a compelling government interest.

¶ 10    The circuit court agreed with defendant that section 11-23.5(b) imposes a restriction on speech based on its content and is not narrowly tailored to serve a compelling government interest. In compliance with Illinois Supreme Court Rule 18 (eff. Sept. 1, 2006), the circuit court found section 11-23.5(b) unconstitutional on its face. Because section 11-23.5(b) was held invalid, the State appeals directly to this court. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013). We granted the Cyber Rights Initiative leave to submit an *amicus curiae* brief in support of the State. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 11                                    II. ANALYSIS

¶ 12    Before this court, the State argues that the circuit court erred in finding section 11-23.5(b) facially unconstitutional because the public distribution of truly private facts is not constitutionally protected. In the alternative, the State asserts that, even if such speech is protected, section 11-23.5(b) is constitutionally valid because it is narrowly tailored to serve a compelling government interest.

¶ 13    Defendant responds by contending that the circuit court correctly found the statute to be unconstitutional because it outlaws protected content-based speech in violation of the United States and Illinois Constitutions. U.S. Const., amend. I; Ill. Const. 1970, art. I, § 4. She further argues that the distribution of nude images that have been disclosed to another person is constitutionally protected because such images are not truly private facts as the State contends.

¶ 14    The issue of whether a statute is constitutional presents a question of law, which we review *de novo*. *People v. Minnis*, 2016 IL 119563, ¶ 21. All statutes are presumed to be constitutional, and the party challenging a statute's constitutionality bears the burden of clearly establishing its invalidity. *Id.* In addition, a court must construe a statute so as to uphold its constitutionality, if reasonably possible. *Id.*

¶ 15    To resolve this appeal, we must construe section 11-23.5(b) because a court cannot determine whether a statute reaches beyond constitutional limits without first knowing what the statute covers. *Id.* ¶ 25 (citing *United States v. Stevens*, 559 U.S. 460, 474 (2010)). When presented with an issue of statutory construction, this court's primary objective is to ascertain and give effect to the intent of the legislature. *Oswald v. Hamer*, 2018 IL 122203, ¶ 10; *Minnis*, 2016 IL 119563, ¶ 25. The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning. *Oswald*, 2018 IL 122203, ¶ 10; *Minnis*, 2016 IL 119563, ¶ 25. A court will not read language in isolation and must view the statute as a whole,

construing words and phrases in light of other relevant statutory provisions. *Carmichael v. Laborers' & Retirement Board Employees' Annuity & Benefit Fund*, 2018 IL 122793, ¶ 35; *Oswald*, 2018 IL 122203, ¶ 10. Each word, clause, and sentence of a statute must be given a reasonable meaning, if possible, and should not be rendered superfluous. *Oswald*, 2018 IL 122203, ¶ 10; *Murphy-Hylton v. Lieberman Management Services, Inc.*, 2016 IL 120394, ¶ 25. Additionally, we must presume that the legislature did not intend to create absurd, inconvenient, or unjust results. *Carmichael*, 2018 IL 122793, ¶ 35; *Minnis*, 2016 IL 119563, ¶ 25. It is also proper for the court to consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another. *Carmichael*, 2018 IL 122793, ¶ 35; *Murphy-Hylton*, 2016 IL 120394, ¶ 25.

¶ 16                           A. The Necessity for the Law

¶ 17        Section 11-23.5 addresses the problem of nonconsensual dissemination of private sexual images, which is colloquially referred to as "revenge porn." Generally, the crime involves images originally obtained without consent, such as by use of hidden cameras or victim coercion, and images originally obtained with consent, usually within the context of a private or confidential relationship. Once obtained, these images are subsequently distributed without consent. Danielle Keats Citron & Mary Anne Franks, *Criminalizing Revenge Porn*, 49 Wake Forest L. Rev. 345, 346 (2014); see Adrienne N. Kitchen, *The Need to Criminalize Revenge Porn: How a Law Protecting Victims Can Avoid Running Afoul of the First Amendment*, 90 Chi.-Kent L. Rev. 247, 247-48 (2015).

¶ 18        The colloquial term "revenge porn" obscures the gist of the crime:

> "In essence, the crux of the definition of revenge porn lies in the fact that the victim did not consent to its *distribution*—though the victim may have consented to its recording or may have taken the photo or video themselves. As a result, the rise of revenge porn has (unsurprisingly) gone hand-in-hand with the increasing use of social media and the Internet, on which people constantly exchange ideas and images without asking permission from the originator." (Emphasis in original.) Christian Nisttáhuz, *Fifty States of Gray: A Comparative Analysis of 'Revenge-Porn' Legislation Throughout the United States and Texas's Relationship Privacy Act*, 50 Tex. Tech. L. Rev. 333, 337 (2018).

Indeed, the term "revenge porn," though commonly used, is misleading in two respects. First, "revenge" connotes personal vengeance. However, perpetrators may be motivated by a desire for profit, notoriety, entertainment, or for no specific reason at all. The only common factor is that they act without the consent of the person depicted. Second, "porn" misleadingly suggests that visual depictions of nudity or sexual activity are inherently pornographic. Mary Anne Franks, *"Revenge Porn" Reform: A View From the Front Lines*, 69 Fla. L. Rev. 1251, 1257-58 (2017); see Diane Bustamante, *Florida Joins the Fight Against Revenge Porn: Analysis of Florida's New Anti-Revenge Porn Law*, 12 Fla. Int'l. U. L. Rev. 357, 364 (2017).

¶ 19        This is a unique crime fueled by technology:

> "We do not live in a world where thousands of websites are devoted to revealing private medical records, credit card numbers, or even love letters. By contrast, 'revenge porn' is featured in as many as 10,000 websites, in addition to being distributed without consent through social media, blogs, emails, and texts. There is a demand for private

nude photos that is unlike the demand for any other form of private information. While nonconsensual pornography is not a new phenomenon, its prevalence, reach, and impact have increased in recent years in part because technology and social media make it possible to 'crowdsource' abuse, as well as make it possible for unscrupulous individuals to profit from it. Dedicated 'revenge porn' sites and other forums openly solicit private intimate images and expose them to millions of viewers, while allowing the posters themselves to hide in the shadows." Franks, *supra*, at 1260-61.

Because the nonconsensual dissemination of private sexual images "so often involves the Internet and social media, the public, law enforcement, and the judiciary sometimes struggle to understand the mechanics of the conduct and the devastation it can cause." Citron & Franks, *supra*, at 347.

¶ 20   For example, in the course of its analysis, the circuit court speculated as follows:

"[W]hen a girlfriend texts a nude selfie to a third party—her boyfriend—she gives up all expectations of privacy in the images. And if she cannot reasonably expect that the image remain private, then didn't the act of sharing it in the first place demonstrate she never *intended* the image to remain private?" (Emphasis in original.)

Such postulating is refuted by reams of scholarship. Moreover, the above comments reflect a fundamental misunderstanding of the nature of such communications. Given the circuit court's factual starting point, the boyfriend to whom a nude selfie is sent is the *second* party to the private communication—not a third party. As a consequence, a girlfriend who transmits such a photo does not automatically relinquish "all expectations of privacy in the images," as the circuit court hypothesized. Contrary to the circuit court's conclusion, the sharing of a private sexual image in a personal and direct communication with an intended recipient does not demonstrate that the transmission was never intended to remain private.

¶ 21   Consent is contextual. "The consent to create and send a photo or the consent to be photographed by another is one act of consent that cannot be equated with consenting to distribute that photo to others outside of the private relationship ***." Erica Souza, *"For His Eyes Only": Why Federal Legislation Is Needed to Combat Revenge Porn*, 23 UCLA Women's L.J. 101, 109-10 (2016); see Citron & Franks, *supra*, at 354-56 (same). Accordingly, criminal liability here does not depend on "whether the image was initially obtained with the subject's consent; rather, it is the absence of consent to the image's distribution that renders the perpetrator in violation of the law." Ava Schein, Note, *When Sharing Is Not Caring: Creating an Effective Criminal Framework Free From Specific Intent Provisions to Better Achieve Justice for Victims of Revenge Pornography*, 40 Cardozo L. Rev. 1953, 1955-56 (2019). The nonconsensual dissemination of private sexual images "is not wrong because nudity is shameful or because the act of recording sexual activity is inherently immoral. It is wrong because exposing a person's body against her will fundamentally deprives that person of her right to privacy." Franks, *supra*, at 1260.

¶ 22   The breadth of the problem is staggering. Four percent of American Internet users "have either had intimate images posted online without their consent or have been threatened with this heinous act. *** [This] is a serious social problem that has a devastating impact on those victimized by it. The 4 percent of American internet users affected by it amounts to millions of individuals." Carrie Goldberg & Adam Massey, *State-Sanctioned Humiliation: Why New York Needs a Nonconsensual Pornography Law*, 89 N.Y. St. B. Ass'n J. 48, 50 (May 2017);

see Schein, *supra*, at 1960 (both citing Amanda Lenhart *et al.*, *Nonconsensual Image Sharing: One in 25 Americans Has Been a Victim of "Revenge Porn,"* Data and Society Research Institute (Dec. 13, 2016), https://datasociety.net/pubs/oh/Nonconsensual_Image_Sharing_ 2016.pdf [https://perma.cc/3XPC-UF64]).

¶ 23 The overwhelming majority of state legislatures have enacted laws criminalizing the nonconsensual dissemination of private sexual images. In 2004, New Jersey was the first state to enact such a statute. Schein, *supra*, at 1973. By 2013, only Alaska and Texas followed suit. However, between 2013 and 2017, 36 additional states enacted criminal statutes, bringing the total to 39. See Franks, *supra*, at 1280-81. In 2015, Illinois enacted its statute (Pub. Act 98-1138, § 5 (eff. June 1, 2015) (enacting 720 ILCS 5/11-23.5)). To date, 46 states and the District of Columbia have enacted legislation prohibiting this conduct. *46 States + DC + One Territory Now Have Revenge Porn Laws*, Cyber Civil Rights Initiative, http://www.cybercivilrights.org/ revenge-porn-laws (last visited July 15, 2019) [https://perma.cc/JUX4-B4GK]; see Schein, *supra*, at 1973-74 (citing website when it listed 43 states). These statutes "vary widely throughout the United States, each with their own base elements, intent requirements, exceptions, definitions, and penalties." Nisttáhuz, *supra*, at 357. "The mass adoption of these statutes by states on opposite sides of the political spectrum reflects the urgency of the problem." Goldberg & Massey, *supra*, at 50.

¶ 24                                  B. The General Assembly's Solution

¶ 25 Against this historical and societal backdrop, we consider the terms of the statutory provision at issue. Section 11-23.5(b) provides as follows:

> "(b) A person commits non-consensual dissemination of private sexual images when he or she:
>
>> (1) intentionally disseminates an image of another person:
>>
>>> (A) who is at least 18 years of age; and
>>>
>>> (B) who is identifiable from the image itself or information displayed in connection with the image; and
>>>
>>> (C) who is engaged in a sexual act or whose intimate parts are exposed, in whole or in part; and
>>
>> (2) obtains the image under circumstances in which a reasonable person would know or understand that the image was to remain private; and
>>
>> (3) knows or should have known that the person in the image has not consented to the dissemination." 720 ILCS 5/11-23.5(b) (West 2016).

A person convicted under section 11-23.5(b) is subject to forfeiture sanctions. *Id.* § 11-23.5(e). Also, the crime is a Class 4 felony. *Id.* § 11-23.5(f).

¶ 26                                      C. Preliminary Findings

¶ 27 We observe that we cannot avoid addressing the constitutionality of section 11-23.5(b). A court will not consider constitutional issues where a case can be decided on other grounds. *People v. Nash*, 173 Ill. 2d 423, 432 (1996); *People ex rel. Waller v. 1990 Ford Bronco*, 158 Ill. 2d 460, 464-65 (1994). In this case, section 11-23.5(b) covers defendant's alleged conduct, and no other justification for the circuit court's judgment has been asserted. Therefore, as the

circuit court found, it is proper to reach the constitutional issues presented. See, *e.g.*, *United States v. Grace*, 461 U.S. 171, 175-76 (1983).

¶ 28 Additionally, the circuit court determined that section 11-23.5(b) is facially unconstitutional because it is a content-based restriction of speech in violation of the first amendment. Notably, after finding that the statute violated the first amendment, the court held, without specific analysis, that the statute also violated Illinois's constitutional free speech guaranty (Ill. Const. 1970, art. I, § 4). Further, before this court, the parties do not offer any arguments specifically addressing our state constitutional free speech guaranty. Therefore, we consider only federal constitutional principles. See, *e.g.*, *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 502-03 (2009).

¶ 29                                          D. First Amendment

¶ 30 The first amendment, which applies to the states through the fourteenth amendment, provides that government "shall make no law *** abridging freedom of speech." U.S. Const., amends. I, XIV; *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937). "[T]he First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals." *Turner Broadcasting System, Inc. v. Federal Communications Comm'n*, 512 U.S. 622, 641 (1994); see also *Stevens*, 559 U.S. at 468 (stating that "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content"); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (stating that the first amendment "generally prevents government from proscribing speech *** because of disapproval of the ideas expressed").

¶ 31 The United States Supreme Court has held that the dissemination of information is speech within the meaning of the first amendment. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 570 (2011); see *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001). Accordingly, "[a]n individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used or disseminated.' " *Sorrell*, 564 U.S. at 568 (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984)). Also, the Supreme Court has held that first amendment protections for speech extend fully to Internet communications. See *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997) (explaining that Supreme Court case law "provide[s] no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium"); *Minnis*, 2016 IL 119563, ¶ 23 (same). We also recognize that, "whatever the challenges of applying the Constitution to ever-advancing technology," the basic first amendment principles of freedom of speech do not vary "when a new and different medium for communication appears." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 790 (2011).

¶ 32                                     1. No Categorical Exception

¶ 33 In the case at bar, the State asks this court to recognize the nonconsensual dissemination of private sexual images as "a category of speech that has not been protected as a historical matter." There are categories of speech that are " 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' " *R.A.V.*, 505 U.S. at 383 (quoting *Chaplinsky v. New Hampshire*, 315

U.S. 568, 572 (1942)). These categories include incitement, obscenity, defamation, speech integral to criminal conduct, fighting words, child pornography, fraud, true threats, and speech presenting some grave and imminent threat the government has the power to prevent. *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (collecting cases); *Stevens*, 559 U.S. at 468 (same). These categories of speech are well-defined and narrowly limited, and " 'the prevention and punishment of which have never been thought to raise any Constitutional problem.' " *Stevens*, 559 U.S. at 468-69 (quoting *Chaplinsky*, 315 U.S. at 571-72). These categories are outside the area of constitutionally protected speech, and the protection of the first amendment does not extend to them. *R.A.V.*, 505 U.S. at 383.

¶ 34    The United States Supreme Court has rejected a free-floating test for first amendment coverage that balances the relative social costs and benefits on an *ad hoc* basis. Rather, the Supreme Court has permitted content-based restrictions where confined to the few historic, traditional, and long-familiar categories of expression. *Alvarez*, 567 U.S. at 717; *Stevens*, 559 U.S. at 468, 470. The Supreme Court has observed: "Maybe there are some categories of speech that have been historically unprotected, but have not yet been specifically identified or discussed as such in our case law." *Stevens*, 559 U.S. at 472. However, the above-listed categories of unprotected speech "have a historical foundation in the Court's free speech tradition." *Alvarez*, 567 U.S. at 718.

¶ 35    In this case, the circuit court found that the targeted speech did not fit into any categorical first amendment exception. Before this court, the State argues that "state laws protecting individual privacy rights have long been established." According to the State, "history supports the conclusion that States may regulate speech that invades privacy without violating the First Amendment."

¶ 36    We decline the State's invitation to identify a new category of speech that falls outside of first amendment protection. The nonconsensual dissemination of private sexual images, prohibited by section 11-23.5(b) of the Criminal Code (720 ILCS 5/11-23.5(b) (West 2016)), does not fall within an established first amendment categorical exception. We acknowledge, as did the Vermont Supreme Court, that the nonconsensual dissemination of private sexual images "seems to be a strong candidate for categorical exclusion from full First Amendment protections" based on "[t]he broad development across the country of invasion of privacy torts, and the longstanding historical pedigree of laws protecting the privacy of nonpublic figures with respect to matters of only private interest without any established First Amendment limitations." *State v. VanBuren*, 2018 VT 95, ¶ 43. However, we decline to identify a new categorical first amendment exception when the United States Supreme Court has not yet addressed the question. See *id.* ¶ 46. Nevertheless, the consideration of individual privacy that would support the articulation of a first amendment categorical exclusion in this case will carry weight later in our analysis.

¶ 37    Thus far, we have concluded that section 11-23.5(b) implicates the freedom of speech and that the targeted speech does not fit into any first amendment categorical exception. Therefore, first amendment scrutiny is warranted. We must next determine the appropriate level of scrutiny for the statute.

## 2. Degree of Scrutiny

The United States Supreme Court has long held "[c]ontent-based prohibitions, enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people. To guard against that threat the Constitution demands that content-based restrictions on speech be presumed invalid." *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 660 (2004); see *R.A.V.*, 505 U.S. at 382 (stating that content-based regulations are presumptively invalid); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46-47 (1986) (same). Generally, "laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broadcasting System*, 512 U.S. at 643.

Accordingly, courts "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content." *Id.* at 642. A content-based law is justified only if it survives strict scrutiny, which requires the government to demonstrate that the law is narrowly tailored to serve a compelling state interest. *Reed v. Town of Gilbert*, 576 U.S. ___, ___, 135 S. Ct. 2218, 2226 (2015). "The State must specifically identify an 'actual problem' in need of solving [citation], and the curtailment of free speech must be actually necessary to the solution [citation]." *Brown*, 564 U.S. at 799. In other words, if a less restrictive alternative would serve a governmental purpose, a legislature must use that alternative. *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000).

In the case at bar, the circuit court found that section 11-23.5(b) "is a content-based speech restriction because it doesn't target all pictures, videos, depictions, and portrayals, but only those showing nudity or sexual activity." In both the circuit court and before this court, the parties premised their arguments on the assumption that section 11-23.5(b) must survive strict scrutiny to be found constitutional.

However, because this is a first amendment case, we, as a court of review, must decide independently "whether a given course of conduct falls on the near or far side of the line of constitutional protection." *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 567 (1995); see *Boy Scouts of America v. Dale*, 530 U.S. 640, 648-49 (2000). In any event, if the State arguably is considered to have conceded the applicability of strict scrutiny, "it is well established that we, as a court of review, are not bound by a party's concession." *People v. Carter*, 2015 IL 117709, ¶ 22 (citing *Beachem v. Walker*, 231 Ill. 2d 51, 60-61 (2008)).

In contrast to content-based speech restrictions, "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny [citation] because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broadcasting System*, 512 U.S. at 642. We conclude that section 11-23.5(b) is subject to an intermediate level of scrutiny for two independent reasons. First, the statute is a content-neutral time, place, and manner restriction. Second, the statute regulates a purely private matter.

## a. Time, Place, and Manner

It is generally understood "that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."

*Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 647 (1981). Laws that "impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Turner Broadcasting System*, 512 U.S. at 643 (and cases cited therein). "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Government regulation of speech "is content neutral so long as it is *justified* without reference to the content of the regulated speech." (Emphasis in original and internal quotation marks omitted.) *Id.*

¶ 46    Determining "whether a particular regulation is content based or content neutral is not always a simple task." *Turner Broadcasting System*, 512 U.S. at 642. We recognize that section 11-23.5(b) on its face targets the dissemination of a specific category of speech—sexual images. However, the statute is content neutral. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791 (citing *City of Renton*, 475 U.S. at 47-48).

¶ 47    We find *City of Renton* instructive. That case involved the first amendment validity of a Renton, Washington, zoning regulation of adult movie theaters. The Supreme Court observed that the Renton ordinance "does not appear to fit neatly into either the 'content-based' or the 'content-neutral' category. To be sure, the ordinance treats theaters that specialize in adult films differently from other kinds of theaters." *City of Renton*, 475 U.S. at 47. Nevertheless, the Court concluded that the ordinance was "aimed not at the *content* of the films shown at 'adult motion picture theatres,' but rather at the *secondary effects* of such theaters on the surrounding community." (Emphases in original.) *Id.* The Supreme Court agreed with the lower court that "the City Council's '*predominate* concerns' were with the secondary effects of adult theaters, and not with the content of adult films themselves." (Emphasis in original.) *Id.*

¶ 48    Further, in *Turner Broadcasting System*, the Court recognized that "[r]egulations that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns." *Turner Broadcasting System*, 512 U.S. at 659. Nevertheless, the Court further instructed that "[i]t would be error to conclude, however, that the First Amendment mandates strict scrutiny for any speech regulation that applies to one medium (or a subset thereof) but not others." *Id.* at 660. These cases instruct that the proper focus is on whether the government has addressed a category of speech to suppress discussion of that topic.

¶ 49    In the case at bar, section 11-23.5(b) is justified on the grounds of protecting privacy. Section 11-23.5(b) distinguishes the dissemination of a sexual image not based on the content of the image itself but, rather, based on whether the disseminator obtained the image under circumstances in which a reasonable person would know that the image was to remain private and knows or should have known that the person in the image has not consented to the dissemination. 720 ILCS 5/11-23.5(b)(2), (b)(3) (West 2016). There is no criminal liability for the dissemination of the very same image obtained and distributed with consent. The *manner* of the image's acquisition and publication, and not its *content*, is thus crucial to the illegality of its dissemination. See, *e.g.*, *Turner Broadcasting System*, 512 U.S. at 645 (acknowledging

that the statutory "provisions distinguish between speakers in the television programming market. But they do so based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry ***."). "So long as they are not a subtle means of exercising a content preference, speaker distinctions of this nature are not presumed invalid under the First Amendment." *Id.*

¶ 50   Section 11-23.5 does not prohibit but, rather, regulates the dissemination of a certain type of private information. Viewed as a privacy regulation, section 11-23.5 is similar to laws prohibiting the unauthorized disclosure of other forms of private information, such as medical records (410 ILCS 50/3(d) (West 2016)), biometric data (740 ILCS 14/15 (West 2016)), or Social Security numbers (5 ILCS 179/10 (West 2016)). The entire field of privacy law is based on the recognition that some types of information are more sensitive than others, the disclosure of which can and should be regulated. To invalidate section 11-23.5 would cast doubt on the constitutionality of these and other statutes that protect the privacy rights of Illinois residents.

¶ 51   Content-neutral laws are subject to an intermediate level of scrutiny because they generally present a less substantial risk of excising certain ideas or viewpoints from the public dialogue. *Minnis*, 2016 IL 119563, ¶ 33 (citing *Turner Broadcasting System*, 512 U.S. at 642). Section 11-23.5(b) meets this standard.

¶ 52                                   b. Purely Private Matter

¶ 53   We conclude that section 11-23.5(b) is subject to an intermediate level of scrutiny also because the statute regulates a purely private matter. Speech on matters of public concern lies at the heart of first amendment protection. The first amendment reflects a national commitment to the principle that debate on public issues should be robust and uninhibited. Accordingly, speech on public issues occupies the highest position of the hierarchy of first amendment values and is entitled to special protection. *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (and cases cited therein).

¶ 54   However, first amendment protections are less rigorous where matters of purely private significance are at issue:

>   "That is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest: '[T]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas'; and the 'threat of liability' does not pose the risk of 'a reaction of self-censorship' on matters of public import." *Id.* at 452 (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 760 (1985)).

"While such speech is not totally unprotected by the First Amendment [citation], its protections are less stringent." *Dun & Bradstreet*, 472 U.S. at 760.

¶ 55   The Supreme Court has articulated some guiding factors:

>   "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community [citation], or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public [citation]. [Citations.] The arguably inappropriate or controversial character of a statement is irrelevant to the question

whether it deals with a matter of public concern." (Internal quotation marks omitted.) *Snyder*, 562 U.S. at 453.

Deciding whether speech is of public or private concern requires an examination of the content, form, and context of that speech, as revealed by the entire record. *Id.* "In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Id.* at 454.

¶ 56    Applying these principles to the instant case, we have no difficulty in concluding that the nonconsensual dissemination of the victim's private sexual images was not an issue of public concern. Matthew was telling his and defendant's families and friends that it was defendant's fault that their relationship ended. Defendant responded with a letter, in which she explained her version of events. To this letter defendant attached the victim's private sexual images along with text messages between the victim and Matthew. The victim's private sexual images, in context with her and Matthew's text messages, were never in the public domain. They do not relate to any broad issue of interest to society at large. The message they convey is not a matter of public import. *Cf. id.* (holding that messages on protest signs at a private funeral related to broad issues of interest to society at large and were matters of public import). Rather, the public has no legitimate interest in the private sexual activities of the victim or in the embarrassing facts revealed about her life. See *United States v. Petrovic*, 701 F.3d 849, 856 (8th Cir. 2012) (nonconsensual dissemination of a victim's private nude photos "may be proscribed consistent with the First Amendment").

¶ 57    In sum, section 11-23.5(b) does not pose such inherent dangers to free expression or present such potential for censorship or manipulation as to justify application of strict scrutiny. Therefore, the appropriate standard to apply is the intermediate level of first amendment scrutiny. See *Turner Broadcasting System*, 512 U.S. at 661-62.

¶ 58                            3. Applying Intermediate Scrutiny

¶ 59    In the context of the first amendment's guaranty of freedom of speech, intermediate scrutiny is variously described in similar forms. Generally, to survive intermediate scrutiny, the law must serve an important or substantial governmental interest unrelated to the suppression of free speech and must not burden substantially more speech than necessary to further that interest or, in other words, must be narrowly tailored to serve that interest without unnecessarily interfering with first amendment freedoms, which include allowing reasonable alternative avenues of communication. See *id.* at 662; *Ward*, 491 U.S. at 791; *City of Renton*, 475 U.S. at 50; *Heffron*, 452 U.S. at 647-48; *Minnis*, 2016 IL 119563, ¶ 36; *People ex rel. Ryan v. World Church of the Creator*, 198 Ill. 2d 115, 121 (2001).

¶ 60    Accordingly, in the context of the first amendment, fit matters. Even when the Supreme Court is not applying strict scrutiny, the Court still requires a fit that is not necessarily perfect but reasonable, a fit that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, a fit that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective. *McCutcheon v. Federal Election Comm'n*, 572 U.S. 185, ___, 134 S. Ct. 1434, 1456-57 (2014).

¶ 61    In the case at bar, we conclude that section 11-23.5 serves a substantial government interest. "It is a traditional exercise of the States' police powers to protect the health and safety of their citizens." (Internal quotation marks omitted.) *Hill v. Colorado*, 530 U.S. 703, 715

(2000). This court has long recognized "[i]t is clear that in the exercise of the police power, government may act to regulate, restrain or prohibit that which is harmful to the public welfare even though the regulation, restraint or prohibition might interfere with the liberty or property of an individual." *Chicago National League Ball Club, Inc. v. Thompson*, 108 Ill. 2d 357, 368 (1985); *People v. Warren*, 11 Ill. 2d 420, 424-25 (1957) (collecting cases).

¶ 62    It is well established that government can protect individual privacy rights. In their influential 1890 law review article, future Supreme Court Justice Louis Brandeis and his coauthor argued for recognition of a distinct right to privacy. Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890). Reviewing various developments in the common law, the article described one of the problems it sought to address:

> "Recent inventions and business methods call attention to the next step which must be taken for the protection of the person, and for securing to the, individual what Judge Cooley calls the right 'to be let alone.' Instantaneous photographs and newspaper enterprise have invaded the sacred precincts of private and domestic life; and numerous mechanical devices threaten to make good the prediction that what is whispered in the closet shall be proclaimed from the house-tops. For years there has been a feeling that the law must afford some remedy for the unauthorized circulation of portraits of private persons ***." (Internal quotation marks omitted.) *Id.* at 195.

Reviewing case law, the article explained that then-existing causes of action, such as breach of trust and property-based claims, had long been used to protect privacy interests. However, those actions had become inadequate to protect individual privacy in a changing world. *Id.* at 211. The article explained that the right to privacy does not prohibit publication of matters of public interest. As an example, the article argued that publishing that a private individual has a speech impediment or cannot spell may be proscribed, but publishing the same characteristics of a congressional candidate could not. *Id.* at 214-15.

¶ 63    Today, "the existence of a right of privacy is now recognized in the great majority of the American jurisdictions that have considered the question." Restatement (Second) of Torts § 652A cmt. a, at 377 (1977). "As it has developed in the courts, the invasion of the right of privacy has been a complex of four distinct wrongs, whose only relation to one another is that each involves interference with the interest of the individual in leading, to some reasonable extent, a secluded and private life ***." *Id.* cmt. b, at 377. Relevant here is the tort of public disclosure of private facts. *Id.* § 652D. To state a cause of action, the plaintiff must prove that (1) the defendant gave publicity (2) to the plaintiff's private and not public life (3) and that the matter made public was highly offensive and (4) not of legitimate public concern. *Doe v. TCF Bank Illinois, FSB*, 302 Ill. App. 3d 839, 841 (1999); see Restatement (Second) of Torts § 652D cmt. d (1977); Prosser and Keeton on the Law of Torts § 117, at 856-57 (W. Page Keeton *et al*. eds., 5th ed. 1984). With their longstanding historical pedigree, invasion of privacy torts broadly developed across the country, without any established first amendment limitations, to protect the privacy of nonpublic figures with respect to matters of only private interest. See *VanBuren*, 2018 VT 95, ¶ 43. Thus, section 11-23.5 is distinguishable from the law prohibiting depictions of animal cruelty that the Supreme Court struck down in *Stevens*, 559 U.S. at 469 (stating that the Court was "unaware of any similar tradition excluding depictions of animal cruelty from 'the freedom of speech' codified in the First Amendment" (emphasis omitted)).

¶ 64    Indeed, we observe that the United States Supreme Court has never declared unconstitutional a restriction of speech on purely private matters that protected an individual who is not a public figure for an invasion of privacy. Rather, the Supreme Court has repeatedly reconciled the tension between the right to privacy and free speech by analyzing the specific privacy claim and the public interest in the communication in each case. See, *e.g.*, *Time, Inc. v. Hill*, 385 U.S. 374, 383 n.7 (1967) (declining to announce categorical rule on whether truthful publication of revelations so intimate as to shock community's notions of decency could be constitutionally proscribed); *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491 (1975) (same); *Florida Star v. B.J.F.*, 491 U.S. 524, 532-33 (1989) (same); *Bartnicki*, 532 U.S. at 529 (same).

¶ 65    These Supreme Court decisions reflect three consistent themes. First, speech on matters of private concern that invades the privacy interests of nonpublic figures does not enjoy the same degree of first amendment protection as speech on matters of public concern or relating to public figures. Second, state laws protecting individual privacy rights are long established and are not necessarily subordinate to first amendment free speech protections. Third, the Court is wary of broad rules or categorical holdings framing the relationship between laws protecting individual privacy and the first amendment. See *VanBuren*, 2018 VT 95, ¶ 38.

¶ 66    Specifically, the nonconsensual dissemination of private sexual images causes unique and significant harm to victims in several respects. Initially, this crime can engender domestic violence. Perpetrators threaten disclosure to prevent victims from ending relationships, reporting abuse, or obtaining custody of children. Sex traffickers and pimps threaten disclosure to trap unwilling individuals in the sex trade. Rapists record their sexual assaults to humiliate victims and deter them from reporting the attacks. Schein, *supra*, at 1963; Franks, *supra*, at 1258; see Citron & Franks, *supra*, at 351.

¶ 67    Also, the victims' private sexual images are disseminated with or in the context of identifying information. Victims are frequently harassed, solicited for sex, and even threatened with sexual assault (Schein, *supra*, at 1963-64; Franks, *supra*, at 1259; Citron & Franks, *supra*, at 353) and are fired from their jobs and lose future employment opportunities (Franks, *supra*, at 1259; Bustamante, *supra*, at 365-66; Citron & Franks, *supra*, at 352-53). Victims additionally suffer profound psychological harm. Victims often experience feelings of low self-esteem or worthlessness, anger, paranoia, depression, isolation, and thoughts of suicide. Schein, *supra*, at 1964; Bustamante, *supra*, at 366-67; see Citron & Franks, *supra*, at 350-51; Souza, *supra*, at 103 ("Beyond the obvious embarrassment suffered, victims are often threatened with bodily harm, fired from their jobs, or forced to change their names. Some have been driven to suicide.").

¶ 68    Additionally, the nonconsensual dissemination of sexual images disproportionately affects women, who constitute 90% of the victims, while men are most commonly the perpetrators and consumers. Schein, *supra*, at 1961; Franks, *supra*, at 1259 (acknowledging that the crime affects both men and women but stating that "available evidence to date indicates that the majority of victims are women and girls").

¶ 69    In a brief time span, 43 states and the District of Columbia have enacted laws prohibiting the nonconsensual dissemination of private sexual images. These widespread efforts demonstrate that government recognizes the plight of victims of this crime and their need for protection. See Nisttáhuz, *supra*, at 357. "No one can challenge a state's interest in protecting

the privacy of personal images of one's body that are intended to be private—and specifically, protecting individuals from the nonconsensual publication on websites accessible by the public." *State v. Culver*, 2018 WI App 55, ¶ 19, 384 Wis. 2d 222, 918 N.W.2d 103. Indeed, courts have concluded that the government interest in this regard is "compelling." *VanBuren*, 2018 VT 95, ¶ 59; *People v. Iniguez*, 202 Cal. Rptr. 3d 237, 243 (App. Dep't Super. Ct. 2016). We have no difficulty in concluding that section 11-23.5 serves a substantial government interest unrelated to the suppression of speech.

¶ 70 We next consider whether section 11-23.5 is narrowly tailored to serve this substantial government interest without unnecessarily interfering with first amendment freedoms. In contending that the statute fails strict scrutiny, defendant argues that a penal statute is not the least restrictive means to accomplish the alleged compelling government interest. We earlier concluded that this contention is misplaced. Unlike strict scrutiny, which requires the least restrictive means to accomplish a compelling government interest, the "narrowly tailored" requirement of intermediate scrutiny does not require that the regulation be the least speech-restrictive means of advancing the government interest. Rather, the "narrowly tailored" requirement of intermediate scrutiny is satisfied so long as the law promotes a substantial government interest that would be achieved less effectively absent the law. *Turner Broadcasting System*, 512 U.S. at 662; *Ward*, 491 U.S. at 798-99; *Minnis*, 2016 IL 119563, ¶ 42. Stated otherwise, the law must reasonably fit the substantial government interest. *McCutcheon*, 572 U.S. at ___, 134 S. Ct. at 1456-57.

¶ 71 We conclude that the substantial government interest of protecting Illinois residents from nonconsensual dissemination of private sexual images would be achieved less effectively absent section 11-23.5. "As we have noted in the past, 'the legislature has broad discretion to determine not only what the public interest and welfare require, but to determine the means needed to serve such interest.' " *People v. McCarty*, 223 Ill. 2d 109, 140 (2006) (quoting *Chicago National League Ball Club*, 108 Ill. 2d at 364). It is quite established that "the legislature, under the State's police power, has wide discretion to classify offenses and prescribe penalties for the defined offenses." *People v. La Pointe*, 88 Ill. 2d 482, 500 (1981); see *People v. Simmons*, 145 Ill. 2d 264, 269-70 (1991) (collecting cases).

¶ 72 Defendant's contention overlooks the fundamental difference between civil and criminal law. "The civil action for a tort *** is commenced and maintained by the injured person, and its primary purpose is to compensate for the damage suffered at the expense of the wrongdoer." Prosser and Keeton on the Law of Torts § 2, at 7 (W. Page Keeton *et al.* eds., 5th ed. 1984). The distinction between a tort and a crime "lies in the interests affected and the remedy afforded by the law." *Id.* "The criminal law is concerned with the protection of interests common to the public at large, as they are represented by the entity which we call the state; often it accomplishes its ends by exacting a penalty from the wrongdoer." *Id.* § 1, at 5.

¶ 73 Civil actions are inadequate. "[M]any civil remedies are not only insufficient or unrealistic, but also counterintuitive in terms of their supposed redress or the harm victims suffer." Bustamante, *supra*, at 368. Scholars have explained as follows:

> "Civil suits based on privacy violations are problematic. Most victims want the offensive material removed and civil suits almost never succeed in removing the images due to the sheer magnitude of dissemination. Highly publicized trials often end in re-victimization. Civil litigation is expensive and time-consuming, and many victims

simply cannot afford it. It is difficult to identify and prove who the perpetrator is for legal proceedings because it is so easy to anonymously post and distribute revenge porn. Even when victims can prove who the perpetrator is in court and win money damages, many defendants are judgment-proof so victims cannot collect.

   \*\*\*

   Further, a court order requiring a defendant or website to remove the images would fail to remove the images from the web entirely, particularly as they appear on numerous sites. Because most perpetrators are judgment-proof, and injunctive relief may be difficult to obtain and would ultimately fail to remove the images, civil suits are poor remedies. As perpetrators frequently have nothing to lose, which is why they engage in this behavior in the first place, civil suits do not deter revenge porn." (Internal quotation marks omitted.) Kitchen, *supra*, at 251-53.

Accord Souza, *supra*, at 111-15; Citron & Franks, *supra*, at 357-59.

¶ 74   Additionally, copyright law might appear to be a viable option for victims to remove nonconsensual private sexual images from the Internet. If the victim created such an image herself, then she is considered the copyright owner and would be entitled to protection under federal copyright law. Such copyright infringement protection could result in the removal of such images from a website. Souza, *supra*, at 115.

¶ 75   However, registering the copyright

   "requires the victim to be exposed all over again—this time to the government. So, ironically, to copyright an image and stop strangers from seeing their nude pictures, victims have to send more pictures of their naked body to more strangers (the individuals at the U.S. Copyright Office). Though a successful registration can effectuate a takedown from the identified website, the registered images are sent to the copyright office and appear in the Library of Congress' public catalog alongside copyright owners' names and image descriptions. Though copyright law can provide help to victims who own the copyright of their images and are willing to register them, this avenue is not available to victims whose posted photographs or videos were created by others." (Internal quotation marks omitted.) *Id.* at 115-16.

Accord Kitchen, *supra*, at 258-61; Citron & Franks, *supra*, at 359-60.

¶ 76   Criminalization is a vital deterrent. "As neither privacy torts nor copyright law successfully removes revenge porn images or deters it in the first instance, a more effective deterrent is necessary." Kitchen, *supra*, at 261; see also Bustamante, *supra*, at 377-78 (same); Schein, *supra*, at 1972 ("It is not merely the insufficiency of other legal and adjudicatory means that merits its criminalization, but also the overtly non-consensual, sexual nature of revenge porn's core."). Section 11-23.5(b) constitutes a reasonable fit whose scope is in proportion to the substantial government interest served. See *McCutcheon*, 572 U.S. at ___, 134 S. Ct. at 1456-57. The General Assembly reasonably determined, in the exercise of the police power, that a criminal law was necessary to combat the evils of nonconsensual dissemination of private sexual images. See *Ward*, 491 U.S. at 801.

¶ 77   We next consider whether section 11-23.5 burdens substantially more speech than necessary. Subsections (a) through (d) are relevant to our analysis. 720 ILCS 5/11-23.5(a)-(d) (West 2016).

¶ 78   Subsection (a) provides as follows:

"(a) Definitions. For the purposes of this Section:

'Computer', 'computer program', and 'data' have the meanings ascribed to them in Section 17-0.5 of this Code.

'Image' includes a photograph, film, videotape, digital recording, or other depiction or portrayal of an object, including a human body.

'Intimate parts' means the fully unclothed, partially unclothed or transparently clothed genitals, pubic area, anus, or if the person is female, a partially or fully exposed nipple, including exposure through transparent clothing.

'Sexual act' means sexual penetration, masturbation, or sexual activity.

'Sexual activity' means any:

(1) knowing touching or fondling by the victim or another person or animal, either directly or through clothing, of the sex organs, anus, or breast of the victim or another person or animal for the purpose of sexual gratification or arousal; or

(2) any transfer or transmission of semen upon any part of the clothed or unclothed body of the victim, for the purpose of sexual gratification or arousal of the victim or another; or

(3) an act of urination within a sexual context; or

(4) any bondage, fetter, or sadism masochism; or

(5) sadomasochism abuse in any sexual context." *Id.* § 11-23.5(a).

Subsection (a) defines nonconsensual dissemination of private sexual images narrowly, including limiting the crime to a confined class of content.

¶ 79 Subsection (b), quoted earlier, states the elements of the offense. Subsection (b) is narrowly tailored in several respects so as not to burden more speech than necessary. First, the images must be "private sexual images" that portray any of several specific features, including the depiction of a person whose intimate parts are exposed or visible, in whole or in part, or who is engaged in a sexual act as defined in the statute. *Id.* § 11-23.5(a), (b)(1)(C). Therefore, the scope of the statute is restricted to images that can fairly be characterized as being of a discreet and personal nature. See *Culver*, 2018 WI App 55, ¶ 12 (observing that the "private representation" element in Wisconsin's nonconsensual dissemination statute, which is similar to the definition of "private sexual images" in section 11-23.5(b), narrows the statute's application). As a consequence, the statute does not apply to circumstances in which the subject images are not of a private sexual nature.

¶ 80 Second, the person portrayed in the image must be over the age of 18 and identifiable from the image or information displayed in connection with the image. 720 ILCS 5/11-23.5(b)(1)(A)-(B) (West 2016). The statute is inapplicable if the image does not contain sufficient information to identify the person depicted. Therefore, section 11-23.5(b) burdens only speech that targets a specific person.

¶ 81 Third, the image must have been obtained under circumstances in which a reasonable person would know or understand that it was to remain private. *Id.* § 11-23.5(b)(2). We construe this provision as requiring a reasonable awareness that privacy is intended by the person depicted. This requirement limits the statute's application to the types of personal, direct interactions or communications that are typically involved in a close or intimate relationship.

See *Minnis*, 2016 IL 119563, ¶ 21 (recognizing that, where possible, a court must construe a statute so as to uphold its constitutionality). Thus, this provision ensures that the statute is inapplicable if the image was obtained under circumstances where disclosure to another is a natural and expected outcome.

¶ 82    Fourth, the person who disseminates such an image must have known or should have known that the person portrayed in the image has not consented to the dissemination. 720 ILCS 5/11-23.5(b)(3) (West 2016). The lack of consent to dissemination forms the core of the statute and its protective purpose. As with the expectation of privacy discussed above, we construe this provision to incorporate a reasonable awareness of the lack of consent to dissemination. Where the person portrayed in the image has consented to its disclosure, the statute simply does not apply and poses no restriction on the distribution of the image to others.

¶ 83    Fifth, the statute specifically requires that the dissemination of private sexual images be intentional. *Id.* § 11-23.5(b)(1). Therefore, the probability that a person will inadvertently violate section 11-23.5(b) while engaging in otherwise protected speech is minimal.

¶ 84    Section 11-23.5 also includes several specific exemptions. Subsection (c) provides as follows:

"(c) The following activities are exempt from the provisions of this Section:

(1) The intentional dissemination of an image of another identifiable person who is engaged in a sexual act or whose intimate parts are exposed when the dissemination is for the purpose of a criminal investigation that is otherwise lawful.

(2) The intentional dissemination of an image of another identifiable person who is engaged in a sexual act or whose intimate parts are exposed when the dissemination is made for the purpose of, or in connection with, the reporting of unlawful conduct.

(3) The intentional dissemination of an image of another identifiable person who is engaged in a sexual act or whose intimate parts are exposed when the images involve voluntary exposure in public or commercial settings.

(4) The intentional dissemination of an image of another identifiable person who is engaged in a sexual act or whose intimate parts are exposed when the dissemination serves a lawful public purpose." *Id.* § 11-23.5(c).

These exemptions shield from criminal liability any dissemination of a private sexual image that advances the collective goals of ensuring a well-ordered system of justice and protecting society as a whole. In addition, subsection (c)(3) recognizes that public disclosure has been sanctioned based on the very nature of such an image. Finally, the statute does not apply to electronic communication companies that provide access to the Internet, public mobile services, or private radio services. *Id.* § 11-23.5(d).

¶ 85    Based on the statutory terms set forth above, section 11-23.5 is narrowly tailored to further the important governmental interest identified by the legislature. Accordingly, we conclude the statute does not burden substantially more speech than necessary.

¶ 86    Also, we observe that reasonable avenues of communication remain. As the United States Supreme Court has "emphasized on more than one occasion, when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the

statutory goal." *Hill*, 530 U.S. at 726. Under section 11-23.5, "[p]eople remain free to produce, distribute, and consume a vast array of consensually disclosed sexually explicit images. Moreover, they remain free to criticize or complain about fellow citizens in ways that do not violate the privacy rights of others." Franks, *supra*, at 1326. Section 11-23.5, with its narrow tailoring,

> "does not come close to shutting down the vast number of ways in which people may vent their anger and aggression. The Internet has provided innumerable opportunities for aggressive and offensive interactions, and the First Amendment largely protects those opportunities. The First Amendment does not, however, protect the unauthorized distribution of personal, private, and intimate images unrelated to any public interest." *Id.* at 1326-27.

In this case, defendant makes no argument that her speech would have been in any way stifled by not attaching the victim's private sexual images to her letter. We hold that section 11-23.5 satisfies intermediate scrutiny.

¶ 87                            E. First Amendment Overbreadth

¶ 88        We have concluded that section 11-23.5 does not improperly restrict defendant's freedom of speech as guaranteed by the first amendment. However, in support of the circuit court's order, defendant alternatively contends that section 11-23.5(b) is facially unconstitutional because it is overbroad. We do not agree.

¶ 89        The first amendment overbreadth doctrine looks not at whether a law improperly regulates speech based on viewpoint or content but at the appropriate scope of the regulation. See *Osborne v. Ohio*, 495 U.S. 103, 112 (1990) (recognizing that, where a statute regulates expressive conduct, it may be found to be unconstitutionally overbroad if it "criminalizes an intolerable range of constitutionally protected conduct"). Generally, a defendant seeking to assert a facial challenge would be required to establish that there is no set of circumstances under which the statute would be valid. *Minnis*, 2016 IL 119563, ¶ 24. However, the overbreadth doctrine permits a party to challenge a statute as a facial violation of the first amendment, even if that party's conduct would not fall within the amendment's protection. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); see also *People v. Relerford*, 2017 IL 121094, ¶ 50; *Minnis*, 2016 IL 119563, ¶¶ 14, 24. A facial challenge based on first amendment overbreadth is permitted out of concern that the threat of enforcement of an overbroad law may chill or deter constitutionally protected speech, particularly where the statute imposes criminal penalties. *Virginia v. Hicks*, 539 U.S. 113, 119 (2003); see also *Minnis*, 2016 IL 119563, ¶ 24; *People v. Melongo*, 2014 IL 114852, ¶ 24.

¶ 90        Under the first amendment's overbreadth doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008); see also *Relerford*, 2017 IL 121094, ¶ 50 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972)). The doctrine operates to balance two competing social costs—the chilling effect on constitutionally protected speech against the invalidation of a law that is entirely constitutional in some of its applications. *Williams*, 553 U.S. at 292 (citing *Hicks*, 539 U.S. at 119-20). In order to be unconstitutional, the overbreadth must be "substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." (Emphasis omitted.) *Id.* at 292-93 (citing *Board of Trustees of the State University of New York v. Fox*,

492 U.S. 469, 485 (1989), and *Broadrick*, 413 U.S. at 615); see also *Stevens*, 559 U.S. at 473. "The 'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.' " *Williams*, 553 U.S. at 303 (quoting *Members of City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)). Under intermediate scrutiny, a content-neutral statute is overbroad only when it burdens substantially more speech than necessary to advance its substantial governmental interest. *Turner Broadcasting System*, 512 U.S. at 662; *Minnis*, 2016 IL 119563, ¶ 44.

¶ 91    Because the invalidation of a statute on overbreadth grounds is "strong medicine," it is to be applied "only as a last resort" and where the statute is not subject to a limiting construction. *Broadrick*, 413 U.S. at 613; see also *Relerford*, 2017 IL 121094, ¶ 51. If a statute is " 'readily susceptible' " to a narrowing construction that will eliminate its substantial overbreadth, the statute must be upheld. *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397 (1988) (citing *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975)); see also *Hicks*, 539 U.S. at 118-19.

¶ 92    To resolve defendant's overbreadth argument, we must determine whether section 11-23.5(b) impermissibly restricts constitutionally protected expression in a substantial number of its applications when considered in relation to its "plainly legitimate sweep." See *Stevens*, 559 U.S. at 473; *Williams*, 553 U.S. at 292-93. As explained above, the statute includes several elements that operate to significantly limit its application.

¶ 93    In light of these detailed restrictions that serve to confine the sphere of proscribed conduct, we conclude that section 11-23.5(b) is not overbroad. The statute prohibits a certain and limited category of knowing conduct that involves the unauthorized and intentional dissemination of an intensely personal image of another person. It encompasses only an image of a private and sexual nature, which the disseminator must know or understand is to remain private and which is disclosed without the consent of the person depicted in the image. Given the narrowly focused scope of section 11-23.5(b), we conclude that the statute does not prohibit a substantial amount of protected speech when judged in relation to the statute's legitimate sweep. See *Stevens*, 559 U.S. at 473; *Williams*, 553 U.S. at 292-93. As such, it does not burden substantially more speech than necessary to advance its substantial governmental interest. *Turner Broadcasting System*, 512 U.S. at 662; *Minnis*, 2016 IL 119563, ¶ 44.

¶ 94    Despite the fact that the statute includes the several narrowing factors previously discussed, defendant argues that the circuit court correctly determined that section 11-23.5(b) is unconstitutionally overbroad. As support of its overbreadth determination, the circuit court posited several hypothetical scenarios as examples of circumstances in which the statute would impermissibly restrict protected speech.

¶ 95    First, the circuit court stated that, because the statutory definition of "sexual activity" includes acts of "any bondage" or "fetter," section 11-23.5(b) would criminalize the publication of news photographs of arrestees and prisoners, historic photographs of slaves, and publicity posters of escape artists. The circuit court's conclusion is clearly wrong. It is firmly established that a court must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation. *People v. Casas*, 2017 IL 120797, ¶ 18. Each word, clause, and sentence of a statute must be given a reasonable meaning, if possible, and should not be rendered superfluous. *Id.* The court may consider the reason for

the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another. *Id.* Section 11-23.5(b) pertains only to the unauthorized dissemination of "private *sexual* images" and is intended to protect the privacy of victims from the unauthorized disclosure of discreet and personal portrayals. Although section 11-23.5(b) does not include a definition of "bondage," Black's Law Dictionary defines that term to mean "[t]he state or condition of being a slave; *** the condition or state of having one's freedom limited[;] *** [t]he state or practice of being tied up for sexual pleasure." Black's Law Dictionary 216 (10th ed. 2014). Only that portion of the definition relating to "sexual pleasure" has any relevance in the context of section 11-23.5(b). Images depicting arrestees, prisoners, slaves, or escape artists are not sexual in nature and, therefore, do not fall within the purview of section 11-23.5(b).

¶ 96    We similarly reject the circuit court's suggestion that section 11-23.5(b) would impose criminal liability on a person who discovers and shares with other family members nude sketches of his or her grandmother that were created by his or her grandfather but were discovered in an attic after her death. As noted above, we may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another. *Casas*, 2017 IL 120797, ¶ 18. Obviously, the statute is intended to protect living victims from the invasion of privacy and the potential threat to health and safety that is intrinsic in the disclosure of a private sexual image. However, "the deceased by definition cannot personally suffer the privacy-related injuries that may plague the living." *Campbell v. United States Department of Justice*, 164 F.3d 20, 33 (D.C. Cir. 1998); see also *National Archives & Records Administration v. Favish*, 541 U.S. 157, 168-69 (2004) (collecting authorities holding that it is the privacy interest of living family members—not the dead—that protects against public disclosure of photographs and autopsy reports of deceased persons). In light of the fact that a deceased person cannot suffer the types of injuries that section 11-23.5(b) is intended to safeguard against, the statute does not apply to the hypothetical situation suggested by the circuit court.

¶ 97    The circuit court also questioned whether section 11-23.5(b) would criminalize the sharing of nude sketches of a person's grandmother if his or her grandfather had been an artist such as Andrew Wyeth, who created the "Helga Pictures" that remained secret for many years, or Pablo Picasso. Again, we must consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another. *Casas*, 2017 IL 120797, ¶ 18. Given that a model who poses for an artist is aware of that person's profession, it will generally be understood that the sketch or painting may be displayed to others at some point in time. In such a circumstance, the statute would not apply because a reasonable person would not know or understand that the image was to remain private. The same is true of the circuit court's reference to images published in Playboy Magazine and in movies or programs depicting nudity. The people portrayed in such images have clearly consented to public disclosure and dissemination. Indeed, that is the whole point of appearing in such a photograph or film.

¶ 98    And, even if the publication of Wyeth's secret Helga collection would fall within the statute's purview, such a situation is rare and should be addressed on a case-by-case basis. See *Ferber*, 458 U.S. at 773-74 (holding that impermissible applications of a statute that do not amount to more than a small fraction of the materials within the statute's reach should be cured through case-by-case analysis); see also *Broadrick*, 413 U.S. at 615-16; *People v. Anderson*,

148 Ill. 2d 15, 26-27 (1992). A statute will not be held to be overbroad simply because some impermissible applications are conceivable. *Ferber*, 458 U.S. at 772.

¶ 99　　The animating purpose of section 11-23.5(b) is to protect living persons from being victimized by harassment, discrimination, embarrassment, and possible violence resulting from the privacy violation occasioned by the nonconsensual dissemination of private sexual images. The hypothetical examples cited by the circuit court do not establish that section 11-23.5(b) is unconstitutional in a substantial number of its applications when judged against its plainly legitimate sweep. See *Stevens*, 559 U.S. at 473; *Williams*, 553 U.S. at 292-93.

¶ 100　　In concluding that the statute is overbroad, the circuit court also referenced the fact that section 11-23.5(b) does not require that the nonconsensual dissemination of private sexual images be done with "malicious intent." This feature does not render the statute overbroad.

¶ 101　　Initially, we observe that section 11-23.5(b) specifically requires that the dissemination of a private sexual image be *intentional*, that the person who disseminates the image knows or should have known that the person portrayed has not consented to the dissemination and that the image was obtained under circumstances in which a reasonable person would know or understand that the image was to remain private. See 720 ILCS 5/11-23.5(b)(1)-(3) (West 2016). Thus, the circuit court's reference to the lack of a "malicious intent" does not, and cannot, pertain to the lack of a mental state as set forth in sections 4-4 through 4-7 of the Criminal Code. See *id.* §§ 4-4 to 4-7.

¶ 102　　Instead, the circuit court's criticism refers to the fact that the statute does not require proof of an illicit motive or malicious purpose. The circuit court did not, however, cite legal authority for the proposition that a criminal statute necessarily must contain an illicit motive or malicious purpose to survive an overbreadth challenge. In addition, we observe that the motive underlying an intentional and unauthorized dissemination of a private sexual image has no bearing on the resulting harm suffered by the victim. A victim whose image has been disseminated without consent suffers the same privacy violation and negative consequences of exposure, regardless of the disseminator's objective. Therefore, the question of the disseminator's motive or purpose is divorced from the legislative goal of protecting the privacy of Illinois citizens. The explicit inclusion of an illicit motive or malicious purpose would not advance the substantial governmental interest of protecting individual privacy rights, nor would it significantly restrict its reach.

¶ 103　　We recognize that most state laws prohibiting the nonconsensual dissemination of private sexual images expressly require some form of malicious purpose or illicit motive as a distinct element of the offense. Of course, the exact statutory language establishing this element varies. Most of these states provide elaborate descriptions of malice, such as "the intent to harass, intimidate, threaten, humiliate, embarrass, or coerce" (W. Va. Code § 61-8-28a(b) (2019); see N.M. Stat. Ann. § 30-37A-1(A) (2019)) or "the intent to annoy, terrify, threaten, intimidate, harass, offend, humiliate or degrade" (Idaho Code § 18-6609(3)(a) (2019)) or "the intent to harass, intimidate, or coerce" (see Colo. Rev. Stat. § 18-7-801(1)(a) (2019); Mo. Rev. Stat. § 573.110(2); Okla. Stat. tit. 21, § 1040.13b(B)(2) (2019); Va. Code Ann. § 18.2-386.2(A) (2019)). [1] Other states describe simply the intent to "harm" (Ohio Rev. Code Ann.

_____

[1]Such statutes include those of Alabama, Alaska, Arizona, Arkansas, Iowa, Kansas, Kentucky, Maine, Maryland, Michigan, Nevada, New Hampshire, North Carolina, Pennsylvania, Rhode Island, South Dakota, and Vermont. Ala. Code § 13A-6-240(a) (2018); Alaska Stat. § 11.61.120(a) (2018);

§ 2917.211(B)(5) (West 2019); Tex. Penal Code Ann. § 21.16(b)(3) (West 2019)) or "harass" (Minn. Stat. § 617.261(2)(b)(5) (2018)).

¶ 104   In contrast, the legislatures of four states, including our General Assembly, have chosen not to expressly include "malice" as a distinct element of the offense. 720 ILCS 5/11-23.5 (West 2016); see also Wis. Stat. § 942.09 (2017-18); N.J. Stat. Ann. § 2C:14-9 (West 2019); Del. Code Ann. tit. 11, § 1335 (2017).[2]

¶ 105   We conclude that, although a malicious purpose is not expressly mandated, the breadth of section 11-23.5(b) is effectively limited by the five elements and conditions that define the prohibited conduct. First, a violation of section 11-23.5(b) requires proof of an intentional dissemination of a "private sexual image[ ]." 720 ILCS 5/11-23.5(b)(1)(C) (West 2016). Second, that image must consist of a "private sexual image[ ]," which depicts a person whose intimate parts are fully or partially exposed or visible or who is engaged in a sexual act. *Id.* § 11-23.5(a), (b)(1)(C). Third, the person portrayed in the image must be at least 18 years old and identifiable from the image or from information displayed with the image. *Id.* § 11-23.5(b)(1)(A), (B). Fourth, the image must have been obtained under circumstances in which a reasonable person would know or understand that it was to remain private. *Id.* § 11-23.5(b)(2). Fifth, the person who disseminates such an image must have known or should have known that the person portrayed in the image has not consented to the dissemination. *Id.* § 11-23.5(b)(3).

¶ 106   Given this broad compendium of exacting elements and conditions necessary to prove a violation of section 11-23.5(b), we conclude that a wrongful motive or purpose is inherent in the act of disseminating an intensely personal image without the consent of the person portrayed. See *Culver*, 2018 WI App 55, ¶ 22. In our view, section 11-23.5(b) implicitly includes an illicit motive or malicious purpose, and the inclusion of an explicit motive to cause harm would not appreciably narrow its scope. See *id.*

¶ 107   In addition, as we have already explained, the express requirement that the dissemination be intentional severely limits the likelihood that a person will violate the statute inadvertently or accidentally. Such unusual situations do not demonstrate substantial overbreadth and should be addressed on a case-by-case basis. See *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988); see also *Ferber*, 458 U.S. at 773-74; *Broadrick*, 413 U.S. at 615-16.

¶ 108   The circuit court further observed that section 11-23.5(b) does not expressly require a showing of any specific harm to the victim. Again, the circuit court did not cite any legal authority for the proposition that inclusion of an element of harm is necessary to avoid a finding of overbreadth. Moreover, we believe that the unauthorized dissemination of a private sexual

---

Ariz. Rev. Stat. Ann. § 13-1425(A)(3) (2018); Ark. Code Ann. § 5-26-314(a) (2018); Iowa Code § 708.7 (2019); Kan. Stat. Ann. § 21-6101(a)(8) (2018); Ky. Rev. Stat. Ann. § 531.120(1)(a) (West 2019); Me. Rev. Stat. Ann. tit. 17-A, § 511-A(1) (2019-20); Md. Code Ann., Crim. Law § 3-809(c)(1) (2018); Mich. Comp. Laws § 750.145e(1) (2019); Nev. Rev. Stat. § 200.780(1) (2017); N.H. Rev. Stat. § 644:9-a(II)(a) (2018); N.C. Gen. Stat. § 14-190.5A(b) (2018); 18 Pa. Cons. Stat. Ann. § 3131(a) (2018); 11 R.I. Gen. Laws § 11-64-3(a)(4) (2018); S.D. Codified Laws § 22-21-4 (2018); Vt. Stat. Ann. tit. 13, § 2606(b)(1) (2018).

[2]The Delaware statute requires a malicious purpose not as an element of the offense but rather as an aggravating factor in determining the penalty.

image, which by definition must depict a person while nude, seminude, or engaged in sexually explicit activity, is presumptively harmful. *Culver*, 2018 WI App 55, ¶ 24.

¶ 109　　In evaluating the competing social costs at stake, we have held that Illinois has a substantial governmental interest in protecting the privacy of persons who have not consented to the dissemination of their private sexual images. Although defendant claims that section 11-23.5(b) will deter the free speech of persons who have legally and unconditionally obtained the private sexual images of others, her assertion is unpersuasive given the limited application of the statute and the fact that any possible overbreadth is minor when considered in light of the statute's legitimate sweep. Defendant also contends that section 11-23.5 "criminalizes an adult complainant's own stupidity at the expense of the [f]irst [a]mendent." Yet this argument entirely disregards the victim's first amendment right to engage in a personal and private communication that includes a private sexual image. Defendant's crude attempt to "blame the victim" is not well received and reinforces the need for criminalization. Accordingly, defendant has not established that, on balance, the social costs weigh in her favor or that the marginal restraint on constitutionally protected speech is greater than necessary to advance the governmental interest at stake.

¶ 110　　　　　　　　　　　F. Constitutional Vagueness

¶ 111　　Defendant also argues that section 11-23.5(b) is unconstitutionally vague on its face in violation of her right to due process (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2). The argument that a statute is void for vagueness is premised on the notice requirement of the due process clause. *Grayned*, 408 U.S. at 108; *Wilson v. County of Cook*, 2012 IL 112026, ¶ 21. A statute may be challenged as vague on either of two grounds: (1) it fails to give fair warning to allow innocent people to steer clear of its prohibitions, or (2) it contains insufficiently clear standards for those who enforce it and may lead to arbitrary or discriminatory enforcement. *Hill*, 530 U.S. at 732; *Grayned*, 408 U.S. at 108-09; *Wilson*, 2012 IL 112026, ¶ 21. In addition, where a statute involves first amendment rights, it should not be so vague that it chills the exercise of free expression by generating concern over whether such conduct may violate the statute's prohibition. *Grayned*, 408 U.S. at 109; *Wilson*, 2012 IL 112026, ¶ 22. Therefore, "when a statute 'interferes with the right of free speech or of association, a more stringent vagueness test should apply.' " *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (quoting *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)); *Wilson*, 2012 IL 112026, ¶ 22. However, " 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.' " *Williams*, 553 U.S. at 304 (quoting *Ward*, 491 U.S. at 794).

¶ 112　　A vagueness claim based on due process is analytically distinct from a first amendment overbreadth claim and does not depend upon whether a law applies to a substantial amount of protected speech. *Holder*, 561 U.S. at 19-20. A facial challenge to a statute that is premised on due process vagueness grounds can succeed "only if the enactment is impermissibly vague in all of its applications. A [litigant] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Village of Hoffman Estates*, 455 U.S. at 494-95. "That rule makes no exception for conduct in the form of speech." *Holder*, 561 U.S. at 20 (citing *Parker v. Levy*, 417 U.S. 733, 755-57 (1974)). Therefore, the determination of whether a statute is unconstitutionally vague must be decided

based on the particular facts before the court. *Id.* at 18-19. Even where a more stringent standard of vagueness applies, a litigant whose speech is clearly proscribed cannot successfully assert a due process claim of vagueness for lack of notice. *Id.* at 20. "And he certainly cannot do so based on the speech of others." *Id.* Accordingly, we address defendant's claim that section 11-23.5(b) is unconstitutionally vague on its face in relation to her conduct.

¶ 113    Defendant does not contend that section 11-23.5(b) contains insufficiently clear standards for those who enforce it and may lead to arbitrary or discriminatory enforcement. We therefore address only whether the statute provides fair warning sufficient to avoid prosecution. Of critical importance to this inquiry is whether the statute provides "people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits so that one may act accordingly." *Wilson*, 2012 IL 112026, ¶ 21 (citing *Hill*, 530 U.S. at 732, and *Grayned*, 408 U.S. at 108-09).

¶ 114    Initially, defendant contends that section 11-23.5 is facially invalid as unconstitutionally vague because the term "disseminate" is not defined in the statute and does not expressly state to whom, when, where, or how the dissemination must be accomplished. This contention is without merit.

¶ 115    In the absence of a statutory definition, courts presume that the words used in a statute have their ordinary and popularly understood meanings. *Anderson*, 148 Ill. 2d at 28. The term "disseminate" is defined as "to foster general knowledge of." Webster's Third New International Dictionary 656 (1993). In addition, its synonyms include "BROADCAST," "PUBLICIZE," and "SPREAD." *Id.* The same dictionary defines "spread" as "to make more widely known." *Id.* at 2208. In this case, defendant sent a letter to at least one other person that included the private sexual images of the victim without her consent. That conduct unquestionably "foster[ed] general knowledge of" the victim's image and made it "more widely known." Therefore, defendant's conduct clearly fell within the statutory proscription, and she cannot claim that it was vague for lack of notice as to her circumstances. See *Holder*, 561 U.S. at 20; *Anderson*, 148 Ill. 2d at 28. The fact that the statute may be vague as applied to the speech of others is not relevant to the resolution of this appeal. See *Holder*, 561 U.S. at 20; *Village of Hoffman Estates*, 455 U.S. at 495; *Anderson*, 148 Ill. 2d at 28.

¶ 116    Defendant further objects that the statute carves out an exception for dissemination that serves a "lawful public purpose" but does not address what such a purpose might be. See 720 ILCS 5/11-23.5(c)(4) (West 2016). Again, defendant cannot challenge the clarity of statutory language that is inapplicable to her case. We have held that the dissemination of a private sexual image is a private matter, and defendant has presented no argument that she acted in furtherance of a "lawful public purpose." Indeed, she has explained that her dissemination of the image of the victim was for a *personal* reason—to defend herself against Matthew's statements that she was crazy and to explain the reason underlying the breakup of their relationship. Because her conduct was motivated by an entirely personal concern, she is precluded from asserting that the phrase "lawful public purpose" is unconstitutionally vague. It is recognized that "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack." *Hill*, 530 U.S. at 733. As noted above, a litigant cannot argue that statutory language is void for vagueness based on the speech of others. *Holder*, 561 U.S. at 20.

¶ 117 Defendant also argues that the statute violates due process because it imposes criminal liability for the nonconsensual dissemination of a private sexual image if a "reasonable person would know or understand that the image was to remain private." 720 ILCS 5/11-23.5(b)(2) (2016). In defendant's view, the "reasonable person" negligence standard is unconstitutionally vague because it mandates that the defendant "read the minds of others" regarding whether the image was intended to remain private. We do not agree. This court has held that a negligent mental state may be a valid basis for imposing criminal liability and does not violate due process. *Relerford*, 2017 IL 121094, ¶ 22.

¶ 118 We are similarly unpersuaded by defendant's assertion that section 11-23.5 violates due process because a private sexual image that has been shared with another person is not a truly private matter. According to defendant, the "unconditional" disclosure of such an image imposes no duty on the recipient to keep the image private and operates to relinquish all privacy rights of the person depicted therein. Defendant offers no legal support for this assertion, and we have held above that the sharing of a private sexual image is a truly private matter. Moreover, acceptance of defendant's argument would impose the strictures of a commercial transaction on personal and intimate communications by requiring that the person portrayed elicit an express promise from the recipient that the image will be kept private. Defendant has not cited any authority holding that due process requires such formality. Consequently, we reject defendant's argument that a person who receives a private sexual image acquires an ownership interest that entitles him or her to do with it as he or she sees fit, including dissemination to others without the consent of the person portrayed. See *Thompson*, 108 Ill. 2d at 368 (recognizing that a government may exercise its police power to regulate or restrain conduct that is harmful to the public welfare, even where the regulation or restraint may interfere with the property rights of an individual); *Warren*, 11 Ill. 2d at 424-25 (same).

¶ 119 As a final matter, we observe that section 11-23.5 is "regarded as the country's strongest anti-revenge-porn legislation yet" (internal quotation marks omitted) (Bustamante, *supra*, at 388) and has been proposed as the model for a federal statute targeting the nonconsensual dissemination of private sexual images (Souza, *supra*, at 118-20). Indeed, section 11-23.5 is regarded as "a model for all state revenge porn laws." Schein, *supra*, at 1981-88. Based on the foregoing, we find that section 11-23.5 does not unconstitutionally restrict the rights to free speech and due process on the grounds asserted by defendant.

¶ 120                                    III. CONCLUSION
¶ 121 For the foregoing reasons, the judgment of the circuit court of McHenry County is reversed, and the cause is remanded to the circuit court for further proceedings.

¶ 122 Reversed.
¶ 123 Cause remanded.

¶ 124 JUSTICE GARMAN, dissenting:
¶ 125 Even though both parties agree a strict scrutiny analysis applies in this case, the majority concludes an intermediate level of scrutiny is the appropriate standard, finding section 11-23.5(b) of the Criminal Code of 2012 (720 ILCS 5/11-23.5(b) (West 2016)) is a content-neutral time, place, and manner restriction. I, however, would find the statute criminalizes the

dissemination of images based on their content—"private sexual images"—and thus strict scrutiny applies. Moreover, in applying strict scrutiny, I would find the statute is neither narrowly tailored nor the least restrictive means of dealing with the nonconsensual dissemination of private sexual images. Accordingly, I respectfully dissent.

¶ 126    " '[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.' " *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (quoting *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002)). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Arizona*, 576 U.S. ___, ___, 135 S. Ct. 2218, 2226 (2015); see also *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 660 (2004) (noting the presumed invalidity of content-based restrictions on speech and the government's burden of showing their constitutionality); *People v. Alexander*, 204 Ill. 2d 472, 476 (2003) (stating content-based restrictions on speech must survive strict scrutiny, which "requires a court to find that the restriction is justified by a compelling government interest and is narrowly tailored to achieve that interest"). The restriction on " 'speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve.' " *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000) (quoting *Reno v. American Civil Liberties Union*, 521 U.S. 844, 874 (1997)).

¶ 127    Contrary to the majority's belief, the content of the image is precisely the focus of section 11-23.5. It is not a crime under this statute to disseminate a picture of a fully clothed adult man or woman, even an unflattering image obtained by the offender under circumstances in which a reasonable person would know or understand the image was to remain private and he knows or should have known the person in the image had not consented to its dissemination. However, if the man or woman in the image is naked, the content of that photo makes it a possible crime. Thus, one must look at the content of the photo to determine whether it falls within the purview of the statute. See *Reed*, 576 U.S. at ___, 135 S. Ct. at 2227 ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.").

¶ 128    The majority, however, contends section 11-23.5 "does not prohibit but, rather, regulates the dissemination of a certain type of private information." *Supra* ¶ 50. But the statute does not lay out a "privacy regulation," it sets forth a criminal offense. As the statute criminalizes the dissemination of images based on their content, it should be viewed as a content-based restriction on speech that must survive strict scrutiny to be valid.

¶ 129    Assuming the State has a compelling interest in prohibiting nonconsensual dissemination of private sexual images, I would find the statute is not narrowly tailored to promote that interest. The majority cites the Vermont Supreme Court's decision in *VanBuren*, which involved Vermont's statute banning disclosure of nonconsensual pornography. The statute in that case made it a crime to " 'knowingly disclose a visual image of an identifiable person who is nude or who is engaged in sexual conduct, without his or her consent, *with the intent to harm, harass, intimidate, threaten, or coerce the person depicted*, and the disclosure would cause a reasonable person to suffer harm.' " (Emphasis added.) *State v. VanBuren*, 2018 VT 95, ¶ 5 (quoting Vt. Stat. Ann. tit. 13, § 2606(b)(1) (2015)).

¶ 130    As the majority recognizes, numerous other states criminalizing the unlawful dissemination of private sexual images require a similar intent. *Supra* ¶ 103. In its strict scrutiny analysis, the *VanBuren* majority found the statute at issue was narrowly tailored, stating, in part, as follows:

> "Section 2606 defines unlawful nonconsensual pornography narrowly, including limiting it to a confined class of content, a rigorous intent element that encompasses the nonconsent requirement, an objective requirement that the disclosure would cause a reasonable person harm, an express exclusion of images warranting greater constitutional protection, and a limitation to only those images that support the State's compelling interest because their disclosure would violate a reasonable expectation of privacy." *VanBuren*, 2018 VT 95, ¶ 60.

¶ 131    Here, however, section 11-23.5 is not narrowly tailored, and its broad reach could include a wide swath of conduct, including innocent conduct. Unlike the Vermont statute's requirement that the defendant intend "to harm, harass, intimidate, threaten, or coerce the person depicted," section 11-23.5 offers no such "rigorous intent element." See 720 ILCS 5/11-23.5(b) (West 2016). Instead, simply viewing an image sent in a text message and showing it to the person next to you could result in felony charges. Because of the specific intent element, the majority in *VanBuren* stated "[i]ndividuals are highly unlikely to accidentally violate this statute while engaging in otherwise permitted speech." *VanBuren*, 2018 VT 95, ¶ 62. The same cannot be said of individuals in Illinois under this statute.

¶ 132    The majority contends that, "although a malicious purpose is not expressly mandated, the breadth of section 11-23.5(b) is effectively limited by the five elements and conditions that define the prohibited conduct." *Supra* ¶ 105. I disagree. The elements and conditions do not limit the breadth of the statute at all but instead reach an expansive amount of conduct. Unlike those states that specifically require an intent to harm, harass, intimidate, threaten, coerce, embarrass, frighten, terrify, torment, terrorize, degrade, demean, annoy, alarm, or abuse the victim, the Illinois statute requires nothing of the sort. Although the majority finds the statute "implicitly includes an illicit motive or malicious purpose" (*supra* ¶ 106), the absence of any such nefarious intentions proscribed by other states opens the door wide for innocent conduct to be criminalized. The legislature's failure to include any one of the above stated terms belies the majority's claims that "the inclusion of an explicit motive to cause harm would not appreciably narrow its scope." *Supra* ¶ 106.

¶ 133    The Vermont statute also limited a violation to when the disclosure would cause a reasonable person to suffer harm, and it defines "harm" as "physical injury, financial injury, or serious emotional distress." Vt. Stat. Ann. tit. 13, § 2606(a)(2) (2015). Under the Illinois law, there is no objective or subjective harm requirement. *Cf.* Cal. Penal Code § 647(j)(4)(A) (West 2019) (requiring the victim to suffer "serious emotional distress"); Conn. Gen. Stat. § 53a-189c(a) (2015) (requiring the victim to suffer harm as a result of the dissemination); N.D. Cent. Code § 12.1-17-07.2(2)(c) (2017) (requiring "[a]ctual emotional distress or harm" to the depicted individual as a result of the distribution of intimate images); N.M. Stat. Ann. § 30-37A-1(A)(2) (2019) (requiring conduct that "would cause a reasonable person to suffer substantial emotional distress"); Or. Rev. Stat. § 163.472(1)(c), (d) (2017) (requiring the victim to be "harassed, humiliated or injured by the disclosure" and that "[a] reasonable person would be harassed, humiliated or injured by the disclosure"); Utah Code Ann. § 76-5b-203(2)(c)

(LexisNexis 2019) (requiring "actual emotional distress or harm" to the person as a result of the distribution of the intimate image); Wash. Rev. Code § 9A.86.010 (2018) (requiring the offender to know or reasonably know the disclosure of the intimate images would cause harm to the depicted person). The majority, however, presumes the dissemination is harmful. Again, along with the absence of a malicious purpose, the lack of a showing of any specific harm to the alleged victim casts the net of criminality too far in my mind.

¶ 134    A hypothetical posed to the State during oral argument illustrates this point. Two people go out on a date, and one later sends the other a text message containing an unsolicited and unappreciated nude photo. The recipient then goes to a friend, shows the friend the photo, and says, "look what this person sent me." Has the recipient committed a felony? The State conceded that the recipient had, assuming the recipient knew or should have known that the photo was intended to remain a private communication.

¶ 135    The statute also does not provide the least restrictive means of dealing with the problem. See *Playboy*, 529 U.S. at 813 (stating that, "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative"); *Kusper v. Pontikes*, 414 U.S. 51, 59 (1973) ("If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties."). The legislature could provide for a private right of action against an offender. It could also provide avenues of equitable relief, including temporary restraining orders, preliminary injunctions, or permanent injunctions. See, *e.g.*, Ohio Rev. Code Ann. § 2307.66 (LexisNexis 2018) (providing for a civil action resulting from the dissemination of images, including for an injunction, temporary restraining order, and compensatory and punitive damages). Instead, the statute criminalizes the conduct and subjects offenders to a possible term of one to three years in prison.

¶ 136    The majority concludes "[c]ivil actions are inadequate" and cites law review articles in support (*supra* ¶¶ 73-76), but we should "not assume plausible alternatives will fail to protect compelling interests; there must be some basis in the record, in legislative findings or otherwise, establishing the law enacted as the least restrictive means." *Denver Area Educational Telecommunications Consortium, Inc. v. Federal Communications Comm'n*, 518 U.S. 727, 807 (1996) (Kennedy, J., concurring in part and dissenting in part, joined by Ginsburg, J.); see also *Sable Communications of California, Inc. v. Federal Communications Comm'n*, 492 U.S. 115, 128-30 (1989) (noting "the congressional record contains no legislative findings that would justify us in concluding that there is no constitutionally acceptable less restrictive means, short of a total ban, to achieve the Government's interest in protecting minors"). Moreover, "it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals" (*Playboy*, 529 U.S. at 816), and the State has not done so here.

¶ 137    Laws burdening speech based on its content are subjected to "the most exacting scrutiny." *Turner Broadcasting System, Inc. v. Federal Communications Comm'n*, 512 U.S. 622, 642 (1994); *People v. Jones*, 188 Ill. 2d 352, 358 (1999). Here, the statute cannot withstand strict scrutiny, as it is not narrowly tailored to serve the State's interests and less restrictive alternatives are available. Thus, I would find the statute unconstitutional and affirm the circuit court's judgment.

¶ 138    JUSTICE THEIS joins in this dissent.