2021 IL App (2d) 190598-U
No. 2-19-0598
Order filed March 11, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-828 |
| MICHELLE C. LEADER, | ) ) ) | Honorable Robert A. Wilbrandt, Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices McLaren and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence was sufficient to support the defendant's conviction of disorderly conduct, and the statute, as applied to the facts, did not violate the first amendment.

¶ 2    The defendant, Michelle C. Leader, was found guilty by a jury of disorderly conduct by making a false report of a crime. She appeals, contending that the evidence was insufficient to convict her because her conduct did not qualify as criminal under section 26-1(a)(4) of the Criminal Code of 2012 (Code) (720 ILCS 5/26-1(a)(4) (West 2014)). Alternatively, she argues that section 26-1(a)(4), as applied in this case, violates her rights under the first amendment of the United States constitution (U.S. Const., amend. I). We affirm.

¶ 3                                I. BACKGROUND

¶ 4     The evidence at trial was as follows. On April 24, 2016, the defendant's boyfriend, Eric Walleck, reported to the police that she was missing. The next day, April 25, two Round Lake police officers, Chris Murphy and Detective Rick Tinsley, were assigned to the case. They were informed that, in the past, the defendant had complained to the police department that she had been harassed by various people including her father. Those complaints were ultimately closed as unfounded or false.

¶ 5     The police obtained phone numbers of her father and her cousin, and spoke with them. Neither had been in contact with her recently. Murphy spoke with Walleck. Walleck said that he last saw the defendant at her apartment on the afternoon of April 23 and they had planned to go to church the next morning. The police checked text messages between Walleck and the defendant but found nothing significant. There was no recent activity on the defendant's social media accounts. Murphy issued a "critical reach" flyer with the defendant's information to surrounding police jurisdictions.

¶ 6     On April 26, Tinsley obtained the defendant's cell phone records from her carrier. Calling a number shown in the records, he found that it was a text message relating to a prescription. He visited a local Walgreens store and learned that the defendant had picked up a prescription at some point. He did not recall what the prescription was for.

¶ 7     The police then obtained a search warrant for the defendant's apartment. When they entered, they found the apartment clean and orderly, with no signs of struggle. The defendant's phone, keys, and purse, containing her wallet with credit cards and identification, were found. The clothes that Walleck had described her as wearing when he last saw her were in a pile at the foot of her bed, along with her tennis shoes.

¶ 8      At about 7:30 that evening, Edward Collins and his wife were returning home from shopping.  Collins was the director of land preservation and natural resources for the McHenry County Conservation District, and he and his wife resided inside the Glacier Park conservation area.  As they drove into the park, Collins noticed the defendant walking toward park buildings that were not open to the public.  He approached her as she was nearing a residential building and asked her if she was lost and if he could help her.  She said that she needed to find a phone to call her father, and that she had been kidnapped but then let loose in a field.  Collins asked her what field, and she said she did not remember.

¶ 9      Collins offered her his cell phone to use.  She made two calls but neither was answered.  As it was getting cold, Collins invited her to his house to try further calls.  She accepted and got into his car for the short ride to his home.  During the ride, she said that two men had knocked on her door, saying that they were the police.  She had opened the door to find masked men who put a gun to her head and took her away.  She mentioned having been in a room and given juice boxes.  The defendant did not want the police to be called.

¶ 10      At Collins's home, the defendant made more calls.  When she reached someone, she was having difficulty describing her location inside the park, so Collins got on the phone.  He spoke with a man, who said he would come right over after picking up his son.  Collins then called the police chief for the conservation district and explained what happened.  After that, "lots" of police officers came to his house.  The defendant's fiancé and his father arrived before the police.

¶ 11      John Sosnowski, an officer with the McHenry County Sheriff, arrived at Collins' home about 8 p.m.  He spoke first with Collins and then with the defendant.  The defendant told Sosnowski that three men including one who brandished a gun came to her house, blindfolded her, put her in a truck, and drove her to a structure where they put her in the basement for a few days.

This happened on the Friday before. (April 26th, when Sosnowski spoke with her, was a Tuesday.) She did not know where she was taken or what the kidnappers looked like. Sosnowski spoke with the defendant for about five minutes. He did not recall if she seemed disoriented. The Richmond Fire Department responded to the scene to make sure the defendant was okay. She was put in an ambulance and taken to the hospital.

¶ 12     At about 8:30 that evening, Tinsley and Murphy were informed that the defendant had been found. Around 10 p.m., they went to the hospital where she had been taken. Walleck directed them to her room. Upon entering, they found the defendant sitting up in bed, wearing a hospital gown and hooked up to medical equipment. Tinsley testified that the defendant appeared shaken and on the verge of tears. However, he did not see any injuries or marks on her. Medical personnel were treating her. Tinsley did not know whether the defendant had received any medications or how long she had been at the hospital before they arrived, but she did not appear drugged or intoxicated.

¶ 13     The defendant agreed to speak with the police, and Tinsley made three separate recordings of her statements. The first break occurred when a doctor entered the room and was there for perhaps ten minutes. The interview resumed, and then there was a second break before the police asked some follow-up questions. Tinsley did not ask her general questions like "what happened next?" but instead asked leading questions. The defendant did not ask to end the interview or for the police to leave the room, and she does not dispute that her statements were voluntary.

¶ 14     During the interview, the defendant gave the following account. On Saturday, April 23, she and Walleck went to a store. Afterwards, she was tired and worn out from holding up a sign about the Kristofs. She was not sure what time she came home. She decided to stay home and rest. Late at night, she woke and heard someone at the door. When she opened it, there were two

or three masked men wearing black. One held a gun to her head. They blindfolded her, pushed her, and said they would kill her if she said anything. She could not see anything and did not know where they took her. She was in a vehicle trunk for what seemed like a long time. She was taken down stairs to a place that had concrete walls and floor, and left there. There was a toilet there. Eventually she was blindfolded again, thrown into a trunk, and then let out in a field, where she ran.

¶ 15    Asked to provide more details, the defendant said that on the 23rd, she had changed out of the clothes that she wore to the store. She changed into other clothes, which were the same clothes she was wearing throughout the time she was kidnapped. She did not sleep with her shoes on; the men let her put on her shoes before she was blindfolded. They said they would kill her if she said anything or held the sign again; she could not remember what they were talking about. They grabbed her arm and led her out of her apartment through the fire door, down three flights of stairs, out the back door, and into a car or truck. She was thrown into the vehicle and heard closing doors. She hit her head on the back, but not hard. She felt something like a tire. Her hands and feet were not tied, but she did not pull the blindfold off. It seemed like they were in the vehicle for a long time, and there were lots of turns. The vehicle turned left toward Route 120. The road seemed smooth up to where the vehicle stopped. She heard doors opening and a key being used, and then they pulled her out of the vehicle. She almost fell. She did not recall talking or other noises.

¶ 16    They directed her to go down six or seven stairs, without saying anything to her. She heard a heavy metal door and a latch scraping. At the bottom of the steps, she took about four more steps into the room, and then they sat her on the ground and left. She took off the blindfold after they left, but there was no light. Feeling with her hands, she felt the concrete walls and floor, and located the toilet, which she used. There was nothing else in the room. She did not know how

long she was in the room. She slept on the floor. It was cold. They did not hurt her. They gave her some food—a baloney sandwich—and water or juice. When they returned, she might have heard a car, and they might have told her they were going to take her somewhere. There was a little bit of light when the door opened. They were wearing all black clothes and she could not see their faces. They blindfolded her again and dragged her upstairs, and put her in the back of a vehicle. It sounded like the trunk. It seemed that she was in the car for a long time, but it was probably ten minutes. Then they took her out of the vehicle, took the blindfold off, and said she could go. It was daylight. They let her out on a road, but she ran into a big field. She ran through the fields and did not look behind her. She ran for about 20 minutes until she saw some old buildings and found someone to use a phone.

¶ 17    After the second break, the defendant answered follow-up questions. She had been sleeping in her clothes the night she was taken because she intended to go back to Walleck's home that night, but the clothes she was wearing were not the ones she had worn earlier to the store. The men who came to her apartment helped her put on a jacket that was in her living room. She did not know why. She did not try to fight them. They were wearing ski masks and dressed all in black. She was blindfolded and they threw her jacket over her shoulders. She was not sure when she put her shoes on. The place she was taken could have been dirty or dusty. The surface of the area where she was released was smooth and felt like a road. She fell into a little ditch as she was running and landed on her knees. She just wanted to get away. She ran for about 15 or 20 minutes before she found the buildings and people came. The man asked if she needed help and she said she needed to call her dad. They took her to their house. She told them not to call the police, but she could not remember why. She talked to a police officer at the house. She was lying on a

couch, her chest was hurting, she was crying, and the paramedics were with her. She said she did not know a James Kristof, but then agreed that she had heard of Kristof.

¶ 18    Murphy noted that the defendant's person and clothing appeared clean, and there were no marks visible on her body. When he examined her t-shirt, he smelled perfume. He would have expected to see some dirt or grime, or smell other odors from clothing that had been worn for a few days. The defendant told them that she had fallen on her knees in a ditch. The knees of her jeans showed a very faint grass stain.

¶ 19    When the interview was over, the defendant said she wanted to call her fiancé or her dad. As the police were leaving, one of them said, "I hope you get the help you need." Murphy testified that, at the end of the hospital interview, he had questions but still believed that the defendant was kidnapped.

¶ 20    The next day, Murphy returned to the hospital. The staff told him the defendant had been discharged. He went to Walleck's apartment and then to the defendant's apartment, but no one answered the door at either place. As he was leaving, he saw Walleck and the defendant arrive in a car. They came toward him aggressively waving the search warrant and yelling about things being taken from the apartment. Murphy suggested they talk about it inside and they agreed.

¶ 21    After talking together for about 20 minutes, Murphy asked to speak with the defendant alone, and Walleck left. Murphy told the defendant that the investigation was showing that the reported kidnapping was made up. The defendant began crying and admitted that she, or she and Walleck, had lied. She was at Walleck's apartment when he went to report her as missing. She stated that she did it because people were harassing her. She agreed to provide a written statement. Murphy wrote down what she said, and she read it over and signed it. The statement said: "I made a mistake. There's no masked men. I made up the kidnapping story because people were harassing

me." Murphy testified that it was not until that day (April 27) that "things clicked" and he believed that the defendant was lying about having been kidnapped.

¶ 22    In September 2016, the defendant was charged by indictment with knowingly transmitting to Murphy a false report of a kidnapping, "knowing at the time of such transmission that there were no reasonable grounds to believe that such an offense had been committed."  There were several continuances, and a fitness hearing was held in February 2019.  The defendant was found unfit and ordered to inpatient treatment.  On April 12, 2019, the defendant was found fit for trial. After a three-day trial, the jury found her guilty as charged.  She was later sentenced to 12 months of probation, with conditions requiring that she obtain mental health treatment.  She filed a timely appeal.

¶ 23                                II. ANALYSIS

¶ 24    On appeal, the defendant raises two arguments.  She first argues that the elements of the offense were not proven beyond a reasonable doubt because the language of the false report provision, section 26-1(a)(4) of the Code (720 ILCS 5/26-1(a)(4) (West 2014)), does not criminalize her conduct.   She also contends that the statute, as applied to her conduct, is unconstitutional in that it violates her rights under the first amendment (U.S. Const., amend. I).

¶ 25                    A. Construction of False Report Provision

¶ 26    Ordinarily, we review a claim of insufficient evidence under a deferential standard.  See *People v. Collins,* 106 Ill. 2d 237, 261 (1985) (the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt).  Here, however, the defendant does not argue that the evidence presented at trial was deficient in some respect. Rather, she argues that her conduct was not criminal under the false report provision.  That is an argument about the proper

construction of the statutory provision. We review such arguments *de novo*. *In re Appointment of Special Prosecutor*, 2019 IL 122949, ¶ 22.

¶ 27    The false report provision, subsection (a)(4) of the disorderly conduct statute, provides that a person commits disorderly conduct when, *inter alia*, she knowingly

> "[t]ransmits *** in any manner to any peace officer, public officer or public employee a report to the effect that an offense *** has been committed, knowing at the time of the transmission that there is no reasonable ground for believing that the offense *** has been committed."  720 ILCS 5/26-1(a)(4) (West 2014).

The defendant does not dispute that Murphy was a peace officer and that she had no reasonable grounds for believing that the kidnapping had actually occurred. However, she maintains that the statute's use of the words "transmit" and "report" indicates that she must have created the false report of the kidnapping without any interrogation or involvement by the police.

¶ 28    To determine the intent of a legislative enactment such as an ordinance, we begin by examining the language of the statute, which is the most reliable indicator of the legislature's objectives in enacting a particular law. *Yang v. City of Chicago*, 195 Ill. 2d 96, 103 (2001). The statutory language must be afforded its plain and ordinary meaning, and where the language is clear and unambiguous we must apply the statute without resort to further aids of statutory construction. *In re Michael D.*, 2015 IL 119178, ¶ 9. We will not depart from the plain language of a statute by reading into it exceptions, limitations or conditions that conflict with the express legislative intent. *Id.*

¶ 29    The defendant notes that "report" is commonly understood to mean "account," and "transmit" means "send," implying that her account must have been relayed from one person or place to another. She asserts that here, the police sought her out rather than the reverse when they

came to the hospital, and she simply answered the questions posed by them—questions that were of a leading nature. Thus, she argues, the police were "complicit" in the "formation and extraction" of her false report.

¶ 30    This argument is without merit. There is no doubt that, in answering the police officers' questions, the defendant gave an account of what had happened to her, thereby transmitting that account from herself to them. The defendant gave that account voluntarily, responding to the officers at length. She does not argue that she was forced to give her account. The fact that her false account came in response to police questioning is no defense. "[I]t cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question [asked by the government]. *** A citizen may decline to answer the question, or answer it honestly, but [she] cannot with impunity knowingly and willfully answer with a falsehood." *Bryson v. United States*, 396 U.S. 64, 72 (1969).

¶ 31    Moreover, the police came to the defendant's hospital room to interview her for a reason. Walleck had reported her missing, and the officers' preliminary investigation had not yielded any information about the circumstances under which she disappeared. Her phone and wallet were still in her apartment, suggesting that she had not simply gone off on her own. Then when she reappeared, she told both a public employee (Collins) and a peace officer (Sosnowski) that she had been kidnapped. The account she gave to Tinsley and Murphy at the hospital was merely a confirmation and more detailed version of her previous report that an offense had occurred. The language of the statute does not support the defendant's attempt to avoid culpability by minimizing her role in the creation of her false report.

¶ 32    The defendant also argues that her conduct does not fall within the evil that the disorderly conduct statute seeks to prevent, because the statute is aimed at conduct that causes "consternation

or alarm." *People v. Stevens*, 40 Ill. App. 3d 303, 307 (1976) (quoting the definition of "breach of the peace" from *United States v. Woodard*, 376 F.2d 136, 141 (7th Cir. 1967)). She notes that, in *Stevens*, the conduct at issue included a false report of a robbery at gunpoint that created "a potentially explosive situation" in which "the building manager was attracted to the scene and believed it necessary to call the police; *** at least three officers were taken from other duties and sent to the apartment building; *** one police officer was required to enter the apartment in which there was an allegedly armed man; and *** a man was wrongly arrested and fingerprinted." *Id*. at 307-308. She argues that her conduct created no such dire consequences and that indeed the very account given by her at the hospital tended to make her story less believable rather than more so. Thus, she argues, her false report of crime did not fall within the conduct prohibited by the disorderly conduct statute.

¶ 33    We must reject this argument as well. Merely because the defendant's false report in this case did not cause the utmost possible harm does not mean that it did not amount to disorderly conduct. It is manifestly foreseeable that a false report of an armed kidnapping, made after a multi-day disappearance, will cause "consternation and alarm," along with the expenditure of police time and effort to investigate and a dangerous risk that innocent citizens could be caught up in the police response. "[T]he perversion of agency resources and the potential harm to those implicated by false reports of crime justifies punishing those who 'knowingly and willfully' make such reports." *United States v. Rodgers*, 466 U.S. 475, 484 (1984) (false report of kidnapping was within the purpose of similar federal statute, 18 U.S.C. § 1001, which criminalizes false statements to government officials). Further, even if the defendant's statements at the hospital raised some doubts about her account, nothing in her account directly contradicted the evidence uncovered by the police or in itself justified them abandoning the investigation at that point. The police therefore

continued the investigation. Murphy testified that he did not conclude that the defendant was lying about the kidnapping until after he conducted further investigation the next day. We thus reject the defendant's "no harm, no foul" argument. The evidence fully supported the defendant's conviction of disorderly conduct.

¶ 34                                  B. False Reports and the First Amendment

¶ 35     The defendant next argues that her conviction under the false report provision violates her first amendment rights, and thus section 26-1(a)(4), as applied to her conduct and speech, is unconstitutional. "The constitutionality of a statute presents a legal question that we review *de novo*." *People v. Swenson*, 2020 IL 124688, ¶ 19. An as-applied challenge to a statutory provision such as the one raised by the defendant here "asserts that the particular acts which gave rise to [the conviction] fall outside what a properly drawn regulation [of speech] could cover." *Vuagniaux v. Department of Professional Regulation*, 208 Ill. 2d 173, 191 (2003). Statutes are presumed to be constitutional, and a party asserting that a statute is unconstitutional bears the burden of proving its invalidity. *People v. Austin*, 2019 IL 123910, ¶ 14.

¶ 36     The defendant asserts that *United States v. Alvarez*, 567 U.S. 709 (2012), is both controlling and favorable to her first amendment arguments. She is correct about the first assertion but mistaken about the second.

¶ 37     In *Alvarez*, the United States Supreme Court confronted the question of whether the Stolen Valor Act (Act) (18 U.S.C. § 704 (2006)), which criminalized the making of false claims that one had received military honors, violated the first amendment. The Court began by noting that, as the Act criminalized only speech about military honors, it was a restriction on the content of speech and thus was subject to particularly intense scrutiny. See *Alvarez*, 567 U.S. at 716 (quoting *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002), for the proposition that "as

a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content"). The Court noted, however, that certain "historical and traditional categories" of content-based restrictions were permissible under the first amendment. *Id*. at 717. The question was whether lies about military honors, which did not fall within any historically permissible category, were similarly exempt from first amendment protection.

¶ 38 The government argued that false statements in general had no intrinsic value and thus should not receive any first amendment protection. The Court found that such a rule would sweep too broadly, as "some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *Id*. at 718. The Court noted that, although false statements did not enjoy the same level of constitutional protection as truthful statements (*id*.), the mere fact that a statement was false did not necessarily strip it of all such protection, so long as the falsehood was not knowing or reckless (*id*. at 719). The Court then proceeded to analyze whether the Act was appropriately tailored to the evil it sought to prevent, and found that it was not. See *id*. at 728-29 (plurality op., finding the Act unconstitutional under strict scrutiny), 739 (Breyer, J., joined by Kagan, J., finding that intermediate scrutiny was appropriate and that the Act was unconstitutional under that standard).

¶ 39 As part of its analysis, however, the Court recognized that certain restrictions on false speech had long been found permissible under the first amendment. Notably, one of the examples given by the Court of a long-standing permissible criminalization of false speech was 18 U.S.C. § 1001 (West 2006), which makes it a crime to make a material false statement to any official of the federal government. *Alvarez*, 567 U.S. at 220; see also *Rodgers*, 466 U.S. at 484 (holding,

over 50 years ago, that a false report of crime qualified as a false statement punishable under § 1001). After discussing three such well-recognized criminal offenses involving false speech, the Court cautioned that its holding in *Alvarez* should not be construed as implying that any of these laws were open to attack on first amendment grounds. *Id.* at 721.

¶ 40    The defendant argues that *Alvarez* stands for the proposition that false speech may protected under the first amendment. This is true, so far as it goes. The trouble with her argument is that *her* false speech—the false report that she had been kidnapped—is not like the speech found to be constitutionally protected in *Alvarez*. The Supreme Court specifically found that false speech about military honors did not fall into any of the "historical and traditional categories" of speech exempted from first amendment protection. By contrast, the defendant's false kidnapping report falls squarely within the category of "speech integral to criminal conduct" historically denied first amendment protection (*id.* at 717), and just as squarely within the conduct criminalized under 18 U.S.C. § 1001 (false statements to government officials), a statute that the Court identified as valid under the first amendment (*id.* at 720). The holding of *Alvarez* that speech falling within those "historical and traditional categories" is not protected by the first amendment is quite clear. *Id.* at 717; see also *Swenson*, 2020 IL 124688, ¶ 23 ("restrictions on these categories of speech do not fall within the protection of the first amendment and have been upheld"); *Austin*, 2019 IL 123910, ¶ 33 (the categories identified in *Alvarez* are "outside the area of constitutionally protected speech, and the protection of the first amendment does not extend to them"). Thus, *Alvarez* mandates the conclusion that the defendant's criminal statements are not protected by the first amendment.

¶ 41    Moreover, nothing about the defendant's speech here—her false kidnapping report—suggests that it is not properly categorized as outside the scope of first amendment protection. The defendant argues that her false report should receive first amendment protection because (1) her

false statements were made in response to police questioning and thus the police "induced" her false speech, and (2) her false speech itself "exposed its falseness" and thereby "facilitated" the resolution of the missing person investigation. We have already found that none of these contentions have merit. Whether the defendant made her false report of crime in response to police questioning or out of the blue does not matter, as she voluntarily chose to speak with the police about an alleged crime and chose to lie in doing so. This is not a case where the police came to the defendant's door without any reason and then led her to utter a falsehood. The evidence does not support any suggestion of overzealous police targeting of an innocent person going about her business. The defendant bears full responsibility for her decision to make a false report to the police, and cannot invoke the protection of the first amendment for that decision. Similarly, the mere fact that the defendant's false report was not particularly effective is not grounds to extend first amendment protection to her speech. The evidence shows that the defendant planned to create a false narrative that she had been kidnapped and that she wished the police to believe that narrative. That her narrative was not as convincing as she hoped is fortunate; it is not a reason to find her false speech to be constitutionally protected. We therefore reject the defendant's argument that the false report provision, as applied in this case, is unconstitutional.

¶ 42                                    CONCLUSION

¶ 43    For the foregoing reasons, the judgment of the circuit court of McHenry County is affirmed.

¶ 44    Affirmed.