2025 IL App (1st) 240356-U

No. 1-24-0356

Order filed May 30, 2025

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 CR 6357 |
| | ) | |
| BREANNA JOHNSON, | ) | Honorable |
| | ) | Arthur W. Willis, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ODEN JOHNSON delivered the judgment of the court.
Presiding Justices Mikva and Justice Mitchell concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for nonconsensual dissemination of private sexual images over her contention that the State failed to prove her guilt beyond a reasonable doubt.

¶ 2    Following a bench trial, defendant Breanna Johnson was found guilty of two counts of nonconsensual dissemination of private sexual images (720 ILCS 5/11-23.5(b) (West 2022)). The court merged the counts and sentenced defendant to two years' probation. On appeal, defendant contends that the State failed to prove her guilty beyond a reasonable doubt because it did not

present evidence as to how she obtained the images such that a reasonable person would have known that the images were to remain private. We affirm.

¶ 3    Defendant was charged by indictment with two counts of nonconsensual dissemination of private sexual images arising from an incident on February 15, 2023, where she allegedly disseminated images showing N.S. engaged in a sexual act (count I) and with her intimate parts exposed (count II).

¶ 4    At trial, N.S. testified that she was in an "on and off" sexual relationship with a man named Darius (also spelled Darious; no last name given) since 2013. During the relationship, Darius recorded their sexual acts. Defendant and N.S. did not like each other because of N.S.'s relationship with Darius. On February 15, 2023, N.S.'s cousin told her that defendant was talking about N.S. on Facebook Live. N.S. logged into her cousin's Facebook account to view the live feed on defendant's Facebook page. In the live feed, defendant spoke about N.S. and held a phone to the camera to show videos and images of N.S. "giving oral sex" to Darius. N.S.'s face was visible in the videos. Defendant also displayed a photograph of N.S.'s vagina. N.S. recorded the Facebook Live feed.

¶ 5    N.S. identified screenshots from the live feed, which were published in court, and testified that she never shared the sexual images or gave anyone, including Darius, permission to share them. The recording of the Facebook Live feed was published, and N.S. identified defendant and herself in the recording. N.S. never sent the photograph and videos to defendant directly or through a secondary "fake" Facebook profile.

¶ 6    On cross-examination, N.S. acknowledged that she told a detective and an assistant state's attorney (ASA) that her cousin recorded the feed of defendant on Facebook Live. N.S. denied that

her cousin sent the recording to her or that she never personally viewed defendant on Facebook Live. N.S. discovered that Darius also dated defendant at some point after N.S. began dating him. N.S. did not know who sent the video to defendant or who else had access to it.

¶ 7    On redirect examination, N.S. testified that she was never Facebook friends with defendant so she needed to log into her cousin's profile to view the Facebook Live feed. N.S.'s cousin sent her a different recording of defendant talking about posting the video.

¶ 8    Chicago police detective Maria Marquez testified that she interviewed defendant on May 23, 2023. Defendant stated that she received footage of N.S. and Darius "from a fake Facebook account," but was unable to provide further information. Defendant stated that she posted the footage without N.S.'s consent due to "an ongoing issue between" defendant and N.S. Marquez wrote in her supplemental report that defendant posted the footage to Facebook Live "in retaliation for other Facebook posts [N.S.] had made."

¶ 9    The State published a video of the interview, which is in the record on appeal and has been viewed by this court. In relevant part, defendant states she received videos from a "fake" Facebook account before February 15, 2023, and saved them. The "fake" account was for Darius, but defendant believed the videos came from N.S. Defendant believed that N.S. had damaged defendant's vehicle multiple times, including "around" when defendant received the videos. Nobody told defendant to post the videos.

¶ 10    On cross-examination, Marquez stated that N.S. initially stated that she did not go on Facebook to view the live feed. During a follow-up interview, N.S. stated that she received a recording of the live feed from her cousin but also logged into her cousin's Facebook account to view it.

¶ 11 Defendant testified that in December 2022, she received a message from a Facebook account purportedly for Darius, her boyfriend, with videos attached. Defendant was familiar with Darius' Facebook page, so knew it was not his page. Defendant assumed that she was sent the videos "to let [her] know that *** [N.S.] and Darius were still having a relationship." Defendant and N.S. did not "get along," and she assumed N.S. sent the message because N.S. had previously sent defendant videos. Also in December 2022, defendant's vehicle was vandalized, and she believed that N.S. did it. In February 2023, defendant posted a video because she was at her "breaking point," and felt like doing so was the only way that she could get N.S. to leave her alone. Defendant did not believe the video was private based upon her history with N.S. and assumed that N.S. would not send private information.

¶ 12 On cross-examination, defendant stated that the prior videos she received showed N.S.'s face, and Darius naked from the waist up with N.S.'s thong on his face. Defendant did not ask Darius if he sent the videos or if she could put them on Facebook Live. When asked whether it made sense that N.S. would send defendant a video that was embarrassing to N.S., given their relationship, defendant stated that she did not believe the video was embarrassing, but "private."

¶ 13 On redirect examination, defendant testified that she believed N.S. sent the videos to "harass" her. Whoever sent the videos did not tell defendant to keep them private, and so defendant did not believe she needed to do so.

¶ 14 The court found defendant guilty of both counts of nonconsensual dissemination of private sexual images. In ruling, the court commented that N.S. was so concerned about the invasion of her privacy, the dissemination of her private photos and video, that she went to the police. It did not believe that N.S. was "a nefarious individual" who sent the videos to defendant knowing that

defendant would publish them so that N.S. could go to the police and have defendant taken into custody. The court did not find defendant credible when she testified about receiving the videos through a fake Facebook account. It noted that "[t]his action was performed solely, solely in revenge to the victim in this matter."

¶ 15    Defendant filed a motion for a new trial, arguing, *inter alia*, that the State did not establish the circumstances under which she received the images and failed to establish that her actions were unreasonable.

¶ 16    After a hearing, the court denied defendant's motion, stating that the State needed to prove that defendant obtained the images under circumstances in which a reasonable person would know that the images were to remain private. The court noted that the legislature did not intend the relevant statute to limit prohibited incidents to "revenge porn," but extended the statute to individuals such as defendant, who was not N.S.'s paramour but published the video on Facebook "for revenge." Defendant knew the images were meant to remain private because she intended to embarrass N.S. by disseminating them on Facebook. The fact that defendant stated that she received the images from someone with a fake account corroborated this, because they were not initially published on Facebook or shared with the world, but rather sent to defendant alone.

¶ 17    The court merged the counts, sentenced defendant to two years' probation, and ordered her to avoid contact with N.S. and to delete any videos or images of N.S. from her devices and accounts. Defendant did not file a motion to reconsider sentence.

¶ 18    On appeal, defendant argues that the State failed to prove her guilt beyond a reasonable doubt because it did not present evidence about how she obtained the images such that a reasonable person would have known that they were to remain private. Specifically, defendant contends that

because the court did not believe defendant's testimony that she received the images from a "fake" Facebook account, the State failed to prove the manner in which the evidence was obtained such that the court could determine whether a reasonable person would know or understand that the images were to remain private.

¶ 19    At the outset, defendant's argument requires this court to construe section 11-23.5(b) of the Criminal Code of 2012 under which defendant was convicted and, specifically, the meaning of the term "circumstances in which a reasonable person would know or understand that the image was to remain private." 720 ILCS 5/11-23.5(b) (West 2022).

¶ 20    We review claims of statutory interpretation *de novo*. *People v. Tolbert*, 2016 IL 117846, ¶ 12. This court's primary objective in interpreting a statute is to ascertain and give effect to the intent of the legislature. *People v. Marshall*, 242 Ill. 2d 285, 292 (2011). The most reliable indicator of the intent of the legislature is the language of the statute, given its plain and ordinary meaning. *People v. Minnis*, 2016 IL 119563, ¶ 25. In determining the meaning of statutory language, a reviewing court "may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another." *People v. Austin*, 2019 IL 123910, ¶ 96. Where the language is clear and ambiguous, we apply the statute without further aids of statutory construction (*Marshall*, 242 Ill. 2d at 292) and "will enforce it as written and will not read into it exceptions, conditions, or limitations that the legislature did not express" (*Sigcho-Lopez v. Illinois State Board of Elections*, 2022 IL 127253, ¶ 27). The court also presumes that the legislature did not intend to create absurd, inconvenient, or unjust results. *Minnis*, 2016 IL 119563, ¶ 25.

¶ 21 Pursuant to section 11-23.5(b) of the Criminal Code of 2012, "[a] person commits non-consensual dissemination of private sexual images when he or she:

(1) intentionally disseminates an image of another person:

\*\*\*

(B) who is identifiable from the image itself, or whose personal identifying information is displayed or disseminated in connection with the image, or whose identity is known to the person who disseminated the image; and

(C) who is engaged in a sexual act or whose intimate parts are exposed, in whole or in part; and

(2) *obtains the image under circumstances in which a reasonable person would know or understand that the image was to remain private*; and

(3) knows or should have known that the person in the image has not consented to the dissemination." (Emphasis added.) 720 ILCS 5/11-23.5(b) (West 2022).

¶ 22 The purpose of the statute is to protect victims from "(1) the embarrassment and emotional distress of being wrongfully deprived of control over their private sexual images and (2) the accompanying risk of harassment, discrimination, and possible violence." *People v. Devine*, 2023 IL 128438, ¶ 26. Our supreme court has construed section (b)(2) as "requiring a reasonable awareness that privacy is intended by the person depicted," which limits the application "to the types of personal, direct interactions or communications that are typically involved in a close or intimate relationship." *Austin*, 2019 IL 123910, ¶ 81. Further, the provision ensures that "the statute is inapplicable if the image was obtained under circumstances where disclosure to another is a natural and expected outcome." *Id.*

¶ 23    Defendant contends that subsection (b)(2) requires the State to establish the exact manner in which defendant obtained the videos and, separately, that a reasonable person would have understood that the videos were private and intended to remain so. The State, however, argues that the subsection is meant to be read as a whole, and so merely requires proof of defendant obtaining the images *under circumstances* in which a reasonable person would know that the images were to remain private.

¶ 24    "Circumstance" is defined as "[a]n accompanying or accessory fact, event, or condition, such as a piece of evidence that indicates the probability of an event." Black's Law Dictionary 277 (9th ed. 2009). We note that section 11-23.5(b)(2) uses the plural "circumstances." Thus, the legislature, in requiring that the State prove the "circumstances in which a reasonable person would know or understand that the image was to remain private" (720 ILCS 5/11-23.5(b)(2) (West 2022)), determined that the State could show through multiple accompanying facts that a reasonable person would know or understand the images were to remain private. See 720 ILCS 5/11-23.5(b)(2) (West 2022). A trier of fact could, therefore, find that the defendant knew or understood that the images were to remain private when she obtained them through inferences raised from all the evidence presented.

¶ 25    To read the statute as defendant suggests, *i.e.*, that the State needed to prove the exact manner by which defendant received the images, would recognize a condition, exception, or limitation not expressed by the legislature in the plain language of the statute. See *Sigcho-Lopez*, 2022 IL 127253, ¶ 27. As the *Austin* court explained, the purpose of section (b)(2) is to establish that the defendant has a "reasonable awareness that privacy is intended by the person depicted." *Austin*, 2019 IL 123910, ¶ 81. It follows that a court can come to this determination by reviewing

all the facts, events, or conditions ("circumstances") which indicate the probability that the defendant knew that the image was to remain private.

¶ 26    Additionally, the purpose of the statute as a whole is to protect victims from the embarrassment and distress of an invasion of privacy inherent in disclosing a sexual image. See *Devine*, 2023 IL 128438, ¶ 26. To exempt defendant's conduct because the court did not believe her testimony that she received the images from a "fake" Facebook account, *i.e.*, her testimony regarding how she obtained the images, would contradict the purposes of the statute. It would exempt situations where the exact manner in which the defendant obtained the images is contested but the surrounding circumstances establish the defendant's knowledge or understanding that the images were to remain private.

¶ 27    Thus, we reject defendant's interpretation of subsection (b)(2), and hold that the court could determine that the element was met by reviewing all the facts, events, and conditions presented at trial as a whole. We now turn to whether the State presented sufficient evidence regarding this element.

¶ 28    The standard of review for a challenge to the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). This standard applies whether the evidence is direct or circumstantial. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. The reviewing court must allow all reasonable inferences from the record in favor of the

prosecution (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)) and will not reverse a conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt" (*People v. Jackson*, 232 Ill. 2d 246, 281 (2009)).

¶ 29    To sustain a conviction for nonconsensual dissemination of private sexual images, the State needed to prove that defendant (1) intentionally disseminated the images of N.S., who was identifiable from the image and was engaged in a sexual act or whose intimate parts were exposed; (2) obtained the images "under circumstances in which a reasonable person would know or understand that the image[s] [were] to remain private"; and (3) knew or should have known that N.S. had not consented to dissemination. 720 ILCS 5/11-23.5(b) (West 2022). As noted, defendant only contests the second element, that she obtained the images under circumstances in which a reasonable person would know or understand the images were to remain private. 720 ILCS 5/11-23.5(b)(2) (West 2022).

¶ 30    Viewing the evidence in the light most favorable to the State, a rational trier of fact could find that this element was proven beyond a reasonable doubt. The State presented evidence regarding the circumstances in which defendant received the images. Defendant and N.S. were both romantic partners of Darius and had a fraught and hostile relationship with one another. In the recorded interview, defendant informed Detective Marquez that N.S. had vandalized defendant's vehicle. Defendant informed Marquez that she received the sexual images from a "fake" Facebook account for Darius, and that she believed that N.S. sent them to her.

¶ 31    The evidence also established that defendant understood the sexual images were, as she testified on cross-examination, "private" when she posted them on Facebook. In other words, she understood privacy was intended by N.S., the person depicted in the images, as required under

section 11-23.5(b)(2). See *Austin*, 2019 IL 123910, ¶ 81. Defendant told Marquez that she posted the sexual images on Facebook Live due to an "ongoing issue" between her and N.S and in retaliation for other Facebook posts [N.S.] had made." A reasonable inference could be drawn that defendant posted the sexual images on Facebook Live so that their shared acquaintances and others could see them. This, in turn, supports the conclusion that defendant posted the videos for the sole purpose of causing distress and embarrassment to N.S., which are the harms the statute intended to prevent. Defendant's conduct in posting the "private" sexual images on Facebook Live to shame N.S. shows that defendant understood the images were private. This is not a situation where, upon defendant obtaining the images, "disclosure to another is a natural and expected outcome." See *Id*. Defendant chose to disseminate the private sexual videos to Facebook to be viewed by a much wider audience, knowing they were private and without permission to do so.

¶ 32    In sum, reviewing the evidence in the light most favorable to the State, a rational trier of fact could have reasonably concluded that defendant disseminated N.S.'s private information without her consent with a reasonable understanding that privacy of the images was intended. As the evidence is not so "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt," we affirm defendant's conviction. See *Jackson*, 232 Ill. 2d at 281.

¶ 33    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 34    Affirmed.